No. 24-3354

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | |
|---|---|
| CYNTHIA BROWN, ET AL., | : |
| | : On Appeal from the |
| Plaintiffs-Appellants, | : United States District Court |
| | : for the Southern District of Ohio |
| v. | : |
| | : District Court Case No. |
| DAVID YOST, Ohio Attorney General, | : 2:24-cv-01401 |
| in his official capacity, | : |
| | : |
| Defendant-Appellee. | : |
| | : |

## PETITION FOR REHEARING *EN BANC*
## OF APPELLEE OHIO ATTORNEY GENERAL

DAVE YOST
Attorney General of Ohio

T. ELLIOT GAISER
Ohio Solicitor General
 *Counsel of Record*
ZACHERY P. KELLER
KATIE ROSE TALLEY
Deputy Solicitors General
STEPHEN TABATOWSKI
Associate Assistant Attorney General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
thomas.gaiser@ohioago.gov

*Counsel for Appellee*
 *David Yost*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ii

RULE 35(B) STATEMENT AND INTRODUCTION ....................................... 1

STATEMENT .........................................................................................................4

ARGUMENT........................................................................................................ 11

    I.     By disregarding Ohio's sovereign immunity, the panel decision exceeded the Constitution's jurisdictional limits on judicial relief.......... 11

    II.    By subjecting Ohio law to strict scrutiny under the First Amendment, the panel decision implicated an existing circuit split and created an intra-circuit conflict. ............................................................................... 14

CONCLUSION.................................................................................................... 18

CERTIFICATE OF COMPLIANCE ..................................................................20

CERTIFICATE OF SERVICE .......................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013) ......................................................................... 12

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
   576 U.S. 787 (2015) ....................................................................... 16

*Beiersdorfer v. LaRose*,
   2021 WL 3702211 (6th Cir. 2021) .............................................. 3, 4, 17

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ......................................................................... 8

*Clingman v. Beaver*,
   544 U.S. 581 (2005) ....................................................................... 17

*Comm. to Impose Term Limits on the Ohio Sup. Ct. v. Ohio Ballot Bd.*,
   885 F.3d 443 (6th Cir. 2018) ...................................................... 4, 17

*Daunt v. Benson*,
   956 F.3d 396 (6th Cir. 2020) ...................................................... 3, 18

*Dep't of Educ. v. Brown*,
   143 S. Ct. 2343 (2023) ................................................................... 12

*Doe v. Reed*,
   561 U.S. 186 (2010) ........................................................... 15, 18, 19

*Ex parte Young*,
   209 U.S. 123 (1908) ......................................................................... 9

*Fouts v. Warren City Council*,
   2023 WL 6467366 (6th Cir. 2023) ................................................ 14

*In re MCP No. 165*,
   20 F.4th 264 (6th Cir. 2021) ........................................................... 1

*Initiative & Referendum Inst. v. Walker*,
   450 F.3d 1082 (10th Cir. 2006) ...................................................... 3, 16

*Jones v. Markiewicz-Qualkinbush*,
   892 F.3d 935 (7th Cir. 2018)............................................................... 15

*Lichtenstein v. Hargett*,
   83 F.4th 575 (6th Cir. 2023) ................................................................3

*Little v. Reclaim Idaho*,
   140 S. Ct. 2616 (2020).................................................................... 3, 14

*Marijuana Policy Project v. United States*,
   304 F.3d 82 (D.C. Cir. 2002) ......................................................... 3, 16

*Mays v. LaRose*,
   951 F.3d 775 (6th Cir. 2020).................................................................3

*Merrill v. Milligan*,
   142 S. Ct. 879 (2022) ........................................................................ 4

*Meyers v. Grant*,
   486 U.S. 414 (1988)................................................................. 9, 15, 18

*Nev. Comm'n on Ethics v. Carrigan*,
   564 U.S. 117 (2011)......................................................................15, 16

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ............................................................................. 14

*Robinson v. Callais*,
   2024 WL 2176220 (U.S. 2024) ......................................................... 14

*S&M Brands, Inc. v. Cooper*,
   527 F.3d 500 (6th Cir. 2008) ......................................................... 2, 12

*Schmitt v. LaRose*,
   933 F.3d 628 (6th Cir. 2019)........................................................3, 4, 17

*Sossamon v. Texas*,
   563 U.S. 277 (2011) ......................................................................11, 12

*State ex rel. Barren v. Brown*,
  51 Ohio St. 2d 169 (1977)......................................................5

*State ex rel. Schwartz v. Brown*,
  32 Ohio St. 2d 4 (1972)..........................................................5

*Taxpayers United for Assessment Cuts v. Austin*,
  994 F.2d 291 (6th Cir. 1993)............................................... 15

*Thompson v. DeWine*,
  959 F.3d 804 (6th Cir. 2020)..................................................3

## Statutes and Constitutional Provisions

U.S. Const. amend. I............................................................. 15

U.S. Const. art. III, §2 ......................................................... 12

Ohio Const. art. II, §1a.................................................... 4, 5

Ohio Rev. Code §3505.062 ..................................................5

Ohio Rev. Code §3519.01...........................................passim

Ohio Rev. Code §3519.05....................................................16

## RULE 35(B) STATEMENT AND INTRODUCTION

Two days ago, a divided panel declared a longstanding Ohio ballot-initiative law unconstitutional. But, as the dissent noted, the plaintiffs' request for preliminary relief should have failed for "a multitude of reasons." Op.31. The panel's contrary decision raises at least two questions of exceptional importance that warrant the full Court's immediate attention.

The first question is whether sovereign immunity bars the relief the panel ordered. The separation of powers, including the vertical separation between federal and state government, is the "true long-term guardian of liberty" in our federalist system. *In re MCP No. 165*, 20 F.4th 264, 269 (6th Cir. 2021) (Sutton, C.J., dissenting from denial of initial hearing *en banc*). But for such separation to be meaningful, States must remain real sovereigns. As such, sovereign immunity bars federal courts from ordering "any retroactive relief." *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 507–08 (6th Cir. 2008). Federal courts, it follows, do not get to "correct" the past actions of States, even if courts may prevent future unlawful acts. *See id.*

Here, the plaintiffs' claims focus on things that have already happened. During Ohio's initiative process, the Attorney General reviews initiative summaries (before they are extensively circulated to voters) to ensure they are a

fair representation of a proposed constitutional amendment. Ohio Rev. Code §3519.01(A). The Attorney General rejected the plaintiffs' most recent initiative summary; they complain that the Ohio Supreme Court did not grant expedited review of that decision. Because the plaintiffs' requested relief sought to undo past events, the panel should have applied sovereign immunity. It instead crafted an injunction to effectively reverse the Attorney General's already-made decision. Op.30. That was wrong, and the full Court should step in to protect the dignity of Ohio and other States. Otherwise, the panel's decision will signal that federal courts in this Circuit may evade sovereign immunity through carefully worded injunctions and broad theories of "ongoing" violations. *See* Op.15.

The second question is whether First Amendment review applies to state laws that regulate the initiative power and process itself (as opposed to laws that regulate speech about initiatives). That question is the subject of a circuit split. *Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2616–17 (2020) (Roberts, C.J., concurring in the grant of a stay). Some circuits have held that such laws do not implicate the First Amendment. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099–100 (10th Cir. 2006) (*en banc*); *Marijuana Policy Project v. United States*, 304 F.3d 82, 83 (D.C. Cir. 2002). This Court holds otherwise, applying the *Anderson-Burdick* balancing test to such laws. *Schmitt v. LaRose*, 933 F.3d 628, 639 (6th Cir.

2019); *but see id.* at 648–49 (Bush, J., concurring in part and in the judgment); *Beiersdorfer v. LaRose*, 2021 WL 3702211, at *15–*17 (6th Cir. 2021) (Readler, J., concurring in part and concurring in the judgment). This important issue has generated much discussion across the Circuit. *Lichtenstein v. Hargett*, 83 F.4th 575, 590 (6th Cir. 2023); *Thompson v. DeWine*, 959 F.3d 804, 808 n.2 (6th Cir. 2020). And some have more generally noted this Court's propensity to "overindulge" in *Anderson-Burdick* review. *Daunt v. Benson*, 956 F.3d 396, 423 (6th Cir. 2020) (Readler, J., concurring in the judgment); *accord Mays v. LaRose*, 951 F.3d 775, 783 n.4 (6th Cir. 2020). This case thus presents an exceptional opportunity for the *en banc* Court to correct erroneous precedent.

Such review is especially justified here because the panel's decision also creates an intra-circuit conflict. The panel held that the ballot-initiative review process outlined in Ohio Revised Code §3519.01(A) affects core political speech, and thus requires strict scrutiny. Op.17, 24. But other decisions from this Court have applied more deferential review to analogous ballot-initiative laws. *E.g.*, *Schmitt*, 933 F.3d at 641; *Comm. to Impose Term Limits on the Ohio Sup. Ct. v. Ohio Ballot Bd.*, 885 F.3d 443, 448 (6th Cir. 2018); *Beiersdorfer*, 2021 WL 3702211, at *11. The panel's approach thus "goes against" precedent. Op.44 (Bush, J., dissenting). The full Court should step in to avoid further confusion, especially "in

the period close to an election." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring).

## STATEMENT

**I.** The Ohio Constitution reserves to the People the right to initiate constitutional amendments. Ohio Const. art. II, §1a. But before a constitutional initiative makes it on Ohio's ballot, initiative proponents must satisfy a multi-step process. To show initial support, proponents must obtain the signatures of 1,000 registered voters. Ohio Rev. Code §3519.01(A). Then, they must submit the proposed amendment, along with a summary, to the Ohio Attorney General. *Id.*

Within ten days, the Attorney General must review the summary to determine if it is a fair and truthful statement of the proposed amendment. *Id.* This review does not consider whether the proposed amendment is wise policy, *State ex rel. Schwartz v. Brown*, 32 Ohio St. 2d 4, 9–11 (1972), but only whether the summary fairly represents the proposal. *State ex rel. Barren v. Brown*, 51 Ohio St. 2d 169, 170 (1977).

If a proposed initiative clears the Attorney General's review—and the single-law review of Ohio's Ballot Board, *see* Ohio Rev. Code §3505.062—then initiative proponents must circulate petitions, which include the proposed amendment and summary, to Ohio voters. For ballot access, proponents must gather signatures

equaling at least 10 percent of the vote cast for the office of governor at the last gubernatorial election. Ohio Const. art. II, §1a. Proponents are required to supply these signatures by 125 days before Election Day. *Id.* For this Fall's election, that deadline falls on July 3. But importantly, a certified summary has no expiration date. So if proponents fail to accumulate the required signatures by then, they may try again with the same certified language during the next election cycle.

**II.** The plaintiffs are three individuals who wish to amend the Ohio Constitution. Since 2023, they have submitted their proposed amendment and summary (in varying title and form) seven times for the Attorney General's statutorily mandated review.

Each time, the Attorney General was unable to certify the plaintiffs' summary. One submission did not include enough signatures. *See* Sept. 1, 2023 Ltr. from Ohio Att'y Gen. to C. Patel, https://perma.cc/4CKY-L4US. For the other submissions, including the plaintiffs' most recent submission, the Attorney General concluded that the plaintiffs' summaries were not fair representations of their proposed amendment. Mar. 8, 2023 Ltr. from Ohio Att'y Gen. to K. Pierce, https://perma.cc/3689-H5KR; May 12, 2023 Ltr. from Ohio Att'y Gen. to C. Patel, https://perma.cc/G953-BZU3; June 2, 2023 Ltr. from Ohio Att'y Gen. to K. Pierce, https://perma.cc/RRQ5-5KVJ; Aug. 8, 2023 Ltr. from Ohio Att'y Gen. to

K. Pierce, https://perma.cc/LH5L-3YKD; Nov. 17, 2023 Ltr. from Ohio Att'y Gen. to M. Brown, https://perma.cc/Z88R-J9KU; and Mar. 14, 2024 Ltr. from Ohio Att'y Gen. to M. Brown, https://perma.cc/N63K-3MFW.

Ohio law allows initiative proponents to file original actions in the Ohio Supreme Court challenging the Attorney General's summary-review determinations. Ohio Rev. Code §3519.01(C). The Ohio Supreme Court has discretion to expedite such actions as it sees fit. *Compare* Op.5, *with* S.Ct.Pract.R. 12.08.

The plaintiffs did not challenge the Attorney General's determinations as to their first six submissions. After their seventh failed attempt this March, however, the plaintiffs filed an original action in the Ohio Supreme Court. *State ex rel. Brown v. Yost*, No. 2024-0409 (Ohio). The plaintiffs requested expedited consideration of their original action—a request the Attorney General opposed and the Ohio Supreme Court declined. The plaintiffs soon voluntarily abandoned their original action. Notice of Voluntary Dismissal, No. 2024-0409 (May 20, 2024).

**III.** Shortly before dismissing their original action, the plaintiffs filed this separate lawsuit against the Attorney General in federal court. The plaintiffs disclaimed that they were challenging the Attorney General's conclusion that their most-recent summary was not fair and truthful. Op.6. They also assumed that

Ohio's process was viewpoint neutral. *See* Op.3. The plaintiffs argued nonetheless that review under Ohio Revised Code §3519.01(A) is unconstitutional, both facially and as applied to them. They stressed that Ohio's process did not guarantee them immediate, de novo review before the Ohio Supreme Court. *See* Compl., R.1, PageID#6, 10–12.

The plaintiffs moved for preliminary relief. But they did not seek injunctive relief as to any *future* summary. Rather, they sought injunctive relief to force the Attorney General to reverse his already-made decision and "immediately certify" their most recent summary. P.I. Mot., R.2, PageID#41.

The District Court denied that request. First, it concluded that the plaintiffs lacked standing: while the plaintiffs had "struggled to articulate their theory of the case," their claimed injury traced back "to the lack of expedited judicial review" in the Ohio Supreme Court. Op., R.21, PageID#209–10. But the Attorney General had "no authority over the availability of expedited judicial review." *Id.*, PageID#210. Thus, the plaintiffs' alleged injury was not traceable to the Attorney General. *Id.*, PageID#211–12.

Second, the District Court concluded that the plaintiffs were unlikely to succeed on the merits. The court applied *Anderson-Burdick* review. Under that balancing test, judges weigh the burdens of complying with an election law against the

7

State's justifications for the law. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Here, the District Court held that Ohio's strong interests in maintaining the integrity of its initiative process likely outweighed the burdens of Ohio's review process. Op., R.21, PageID#214–21.

**IV.** A divided panel of this Court reversed and ordered preliminary relief, requiring the Attorney General "to send" the plaintiffs' proposed amendment and "most recent summary" to the Ohio Ballot Board for the next phase of Ohio's process. Op.30.

The panel first concluded that the plaintiffs were likely to prove standing. Op.8–13. In its view, the plaintiffs were not seeking "backwards looking" relief "to alter" the Attorney General's "certification decision." Op.10. The plaintiffs were instead seeking to enjoin the Attorney General from enforcing the relevant statute on an ongoing basis. Op.10–11. From there, it followed that the plaintiffs' alleged injuries were traceable to the Attorney General and redressable through an injunction against him. Op.10.

The panel similarly concluded that sovereign immunity was no obstacle. Op.14–16. According to the panel, injunctive relief against the Attorney General was permissible under *Ex parte Young*, 209 U.S. 123 (1908), because the plaintiffs

were seeking prospective relief to prevent an ongoing violation of their rights. Op.14–15.

On the merits, the panel concluded that the plaintiffs were likely to succeed. The panel acknowledged that in this Circuit election laws are typically subject to *Anderson-Burdick* review. Op.17. But when election laws impact core political speech, they are subject to strict scrutiny under *Meyers v. Grant*, 486 U.S. 414 (1988). *Id.* The panel thus concluded that a "hybrid" approach—blending the two tests—was proper. Op.18.

The panel applied that hybrid approach to conclude that the summary attached to an initiative petition under Ohio's process counts as "core political speech." Op.23. That meant Ohio's review process for those summaries needed to survive strict scrutiny. Op.24. Ohio, the panel agreed, has a compelling interest in the integrity of its initiative process. Op.25. But because Ohio's process does not guarantee expedited judicial review, and the Attorney General did not support plaintiffs' request for such review, the process was not narrowly tailored. Op.26. The panel therefore concluded that the plaintiffs were likely to succeed, at least on their as-applied claims. Op.26 & n.13.

Judge Bush dissented. The dissent first identified jurisdictional problems. The plaintiffs' claims did not challenge the Attorney General's role in the review

process; they instead challenged the lack of expedited, de novo judicial review. Op.38. But because the plaintiffs withdrew their original action before the Ohio Supreme Court, there was no longer a live injury in that regard. Op.39, 42. Moreover, any injury as to the lack of timely judicial review was not traceable to the Attorney General or redressable through relief against him. Op.39–41. Finally, the dissent concluded that sovereign immunity barred the plaintiffs' claims, as there was no *prospective* relief available that fit those claims. Op.42.

The dissent also concluded that the plaintiffs were unlikely to succeed on the merits. Applying *Anderson-Burdick* review under this Court's precedent, Op.43–44, the dissent would have held Ohio Revised Code §3519.01 survives that balancing test given the State's strong interest in protecting its initiative process. Op.45.

The dissent disagreed with the majority's decision to apply strict scrutiny under *Grant*. Op.43–44. That case, it explained, was about a restriction on *who* was allowed to engage in political speech. Op.44. The majority's reasoning went against "both precedent and reason" because it would effectively extend *Grant* to "every electoral mechanics regulation" that affects "*how* political speech is reviewed." *Id*.

**ARGUMENT**

The panel was wrong to award preliminary relief affecting Ohio's initiative process for the upcoming election. The plaintiffs are unlikely to succeed, for two reasons. First, sovereign immunity blocks the relief they requested. Second, the First Amendment should not apply to Ohio Revised Code §3519.01(A), or it should apply deferentially. Because both reasons implicate matters of exceptional importance, the Court should grant *en banc* review.

## I. By disregarding Ohio's sovereign immunity, the panel decision exceeded the Constitution's jurisdictional limits on judicial relief.

The panel—attempting to avoid standing problems inherent in the plaintiffs' legal theory—disregarded Ohio's sovereign immunity by awarding backward-looking relief. To protect state sovereignty here and in future cases, *en banc* review is necessary.

"Dual sovereignty is a defining feature of our Nation's constitutional blueprint." *Sossamon v. Texas*, 563 U.S. 277, 283 (2011) (quotation omitted). When the States entered the Union, they did so "with their sovereignty intact." *Id.* (quotation omitted). Given these foundational principles, sovereign immunity sets limits on what the federal courts may order un-consenting States to do. *Id.* at 284. Key here, sovereign immunity prohibits federal courts from granting "any retroactive relief" against the States. *Cooper*, 527 F.3d at 507–08.

The panel decision exceeds this sovereign-immunity limit. To understand how the panel got there, it helps to back up to Article III standing. The authority of federal courts is limited to resolving "Cases" or "Controversies." U.S. Const. art. III, §2. As a constitutional minimum, a plaintiff must have suffered an injury in fact that is traceable to the challenged conduct and redressable by a favorable decision. *Dep't of Educ. v. Brown*, 143 S. Ct. 2343, 2351 (2023). Further, a "Case" or "Controversy" no longer exists if a plaintiff loses a legally cognizable interest in the outcome. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

These standing principles created problems for the plaintiffs from the outset. Their precise theory of the case has been admittedly difficult to pin down, but their core complaint has been the supposed lack of "timely, de novo judicial review" under Ohio's initiative process. Op.38 (Bush, J., dissenting). But the plaintiffs sued a defendant (the Attorney General) that does not manage the Ohio Supreme Court's docket. And the plaintiffs abandoned their original action in that court a few months into their federal case. Combining those points, it is hard to see how a live controversy with a traceable and redressable injury remains.

Sensing these issues, the panel reframed the plaintiffs' claims. It accepted that the plaintiffs' claims were actually about the Attorney General's "decision *itself*." Op.9. But that framing caused another problem. The Attorney General

had already discharged his administrative duties by rejecting the plaintiffs' most recent summary. And no other summary is presently before him. So any relief aimed at the Attorney General's past decision is retrospective.

To overcome that barrier, the panel said that this case was about an ongoing violation. Op.11. But that makes a mess of both the facts and Ohio law. The review of initiative summaries that the Attorney General performs under Ohio law is *not* an ongoing process. Rather, the law requires the Attorney General to fully complete his review within ten days of submissions. Ohio Rev. Code §3519.01(A). Tellingly, the panel's ordered relief says nothing about any *future* submissions. It is aimed instead at the plaintiffs' "most recent summary"—a summary the Attorney General has evaluated and rejected. Op.30. The panel's order should thus be seen for what it is: retroactive relief that sovereign immunity forbids.

One more point about the relief here. By ordering the Attorney General to certify a summary he concluded was misleading, the panel upended election rules in the time close to an election. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The panel was motivated by the dwindling number of days before plaintiffs were required to submit their collected signatures. Op.28. But that should have cut against relief, not for it. *Purcell* "concerns are particularly salient when the plaintiff has 'unreasonably delayed bringing his claim.'" *Fouts v. Warren City Council*, 2023

WL 6467366, at *2 (6th Cir. 2023) (citation omitted). The plaintiffs waited until the *seventh* time that they failed to submit a fair summary before seeking review in the Ohio Supreme Court. They then waited until after that court denied expedited review to argue in federal court that Ohio's longstanding review process was unconstitutional. Even "under extraordinary circumstances," Op.28, the time for judicial relief re-writing Ohio law is not less than four months before voting begins. *E.g.*, *Robinson v. Callais*, 2024 WL 2176220, at *1 (U.S. 2024) (granting stay 174 days before election).

## II. By subjecting Ohio law to strict scrutiny under the First Amendment, the panel decision implicated an existing circuit split and created an intra-circuit conflict.

What First Amendment standard, if any, governs laws regulating state initiative processes? That question is the subject of a circuit split. *Reclaim Idaho*, 140 S. Ct. at 2616–17 (Roberts, C.J., concurring in the grant of a stay). This Court is on the wrong side. The full Court should grant *en banc* review and hold that the First Amendment does not apply *at all* to laws regulating the initiative process. That holding, in addition to being correct, will prevent constant lawsuits in this Circuit and judicial meddling with the States' legislative processes.

**A.** The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. But the First Amendment confers no positive

"right to use governmental mechanics to convey a message," *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011), nor promises that States will even have an initiative process, *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993); *Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 937 (7th Cir. 2018). Rather, it is "up to the people of each State, acting in their sovereign capacity, to decide whether and how to permit legislation by popular action." *Doe v. Reed*, 561 U.S. 186, 212 (2010) (Sotomayor, J., concurring).

True, States that adopt an initiative process must run it without violating rights the Constitution *does* guarantee. For instance, under the First Amendment's Free Speech Clause, States that choose to have an initiative process cannot abridge speech relating to the process. That is why a law restricting who may advocate for an initiative's passage implicates the Constitution. *Grant*, 486 U.S. at 415–16.

But while the "freedom of speech" includes the right to communicate during an initiative campaign or circulation drive, it does not include the freedom to ignore rules governing the mechanics of the initiative process. The initiative power is a legislative power—the "power of direct legislation by the electorate." *Marijuana Policy Project*, 304 F.3d at 85 (quotation omitted). That means the People act as legislators when they make law by initiative. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 814 (2015). The First Amendment does not

confer on legislators (or anyone else) a "right to use governmental mechanics to convey a message." *Carrigan*, 564 U.S. at 127. Just as the First Amendment has no bearing on rules dictating the processes for enacting laws in state legislatures, the Amendment has no bearing on rules governing the processes for enacting laws by direct democracy. *Marijuana Policy Project*, 304 F.3d at 85.

Courts must therefore distinguish between laws "that regulate or restrict the communicative conduct of persons advocating a position in a referendum," which implicate the First Amendment, and laws "that determine the process by which legislation is enacted, which do not." *Walker*, 450 F.3d at 1100.

The Attorney General's review of ballot-initiative summaries falls within the legislation-process category. Section 3519.01(A) does not regulate *who* may speak on behalf of an initiative. Nor does it restrict *what* supporters of an initiative may say about an initiative. It regulates the State's legislative process *itself*. These summaries, after all, become a part of the official petitions by which Ohio voters decide whether to support a proposed initiative. Ohio Rev. Code §3519.05(A). Initiative proponents have no First Amendment right to convey their own message through the content of those official, certified petitions.

**B.** The panel's decision also creates discord within the Circuit. It announced a novel "hybrid" approach to reviewing laws regulating initiatives, Op.18,

then it said strict scrutiny was justified, broadly extending the Supreme Court's decision in *Grant*.

The panel's approach contradicts earlier decisions of this Court. Again, this Court applies *Anderson-Burdick* review to laws regulating the initiative process. *E.g.*, *Schmitt*, 933 F.3d at 639. Under that test, laws are reviewed on a sliding scale based on the level of burden. Laws that fall in the middle tier—that is, laws that are moderately burdensome—receive flexible, but-still-generally-deferential review. *See Clingman v. Beaver*, 544 U.S. 581, 586–87 (2005). This Court has repeatedly applied that deferential scrutiny to laws like the one at issue here; and it has upheld them. *Schmitt*, 933 F.3d at 640–42; *Comm. to Impose Term Limits*, 885 F.3d at 448; *Beiersdorfer*, 2021 WL 3702211, at *8–*15. The laws upheld in *Schmitt* and *Beiersdorfer* are particularly analogous. Both cases involved laws that required election officials to screen the substance of initiative submissions to ensure compliance with Ohio law—meaning that initiative proponents could *not* freely use written materials submitted as part of the initiative process to facilitate whatever public discussion they wanted. *Contra* Op.21.

For similar reasons, the panel's extension of *Grant* is unpersuasive. There, Colorado made it a felony to pay petition circulators. *Grant*, 486 U.S. at 417. The Court applied strict scrutiny to that law because it forbade some people from en-

gaging in public discussion on matters of societal interest. *Id.* at 420. But Colorado's initiative system included other gatekeeping safeguards (like those in Ohio and other States). *Id.* at 416. Nothing in *Grant* indicated that such procedures were of concern under the First Amendment. And since *Grant*, the Supreme Court has suggested that the States have "significant leeway" to regulate their initiative processes. *Reed*, 561 U.S. at 197 (quotation omitted).

**C.** Practical considerations support further review. This Court's application of *Anderson-Burdick* review in this area has already spawned frequent lawsuits. That pliable test "is a dangerous tool" since it gives courts limited guidance about how to make sensitive decisions. *Benson*, 956 F.3d at 424 (Readler, J., concurring in the judgment). The panel's aggressive approach will surely make matters worse. If federal courts can reach strict scrutiny through the simple incantation of "core political speech," Op.24 (quotation omitted), then States are perhaps better off having no initiative process at all, *see Reed*, 561 U.S. at 212 (Sotomayor, J., concurring).

## CONCLUSION

The Court should grant this petition for rehearing *en banc*.

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General
 *Counsel of Record*
ZACHERY P. KELLER
KATIE ROSE TALLEY
Deputy Solicitors General
STEPHEN TABATOWSKI
Associate Assistant Attorney General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
thomas.gaiser@ohioago.gov

*Counsel for Appellee*
 *David Yost*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that, in accordance with Federal Rule of Appellate Procedure 32(g), the foregoing *Petition for Rehearing En Banc* contains 3,891 words in accordance with Federal Rules of Appellate Procedure 35(b)(2) and 40(b).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of May 2024, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER

# APPENDIX

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

CYNTHIA BROWN; CARLOS BUFORD; JENNY SUE ROWE,
            *Plaintiffs-Appellants*,

            *v.*

DAVID YOST, in his official capacity as Ohio Attorney
General,

            *Defendant-Appellee.*

⎤
⎟
⎟
⎟
⎬   No. 24-3354
⎟
⎟
⎟
⎦

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:24-cv-01401—James L. Graham, District Judge.

Decided and Filed:  May 29, 2024

Before:  MOORE, BUSH, and MATHIS, Circuit Judges.

─────────────────

#### COUNSEL

**ON BRIEF:**  Mark R. Brown, CAPITAL UNIVERSITY, Columbus, Ohio, Oliver Hall, CENTER FOR COMPETITIVE DEMOCRACY, Washington, D.C., for Appellants.  T. Elliot Gaiser, Katie Rose Talley, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court in which MATHIS, J., joined.  BUSH, J. (pp. 31–47), delivered a separate dissenting opinion.

─────────────────

#### OPINION

─────────────────

KAREN NELSON MOORE, Circuit Judge.  To get a proposed constitutional amendment on the Ohio ballot, petitioners must submit their amendment, a summary of their amendment,

and one thousand qualified supporting signatures to the Ohio Attorney General.  The Ohio Attorney General must then determine if the summary is a fair and truthful statement of the proposed amendment and, if so, certify the summary.  Only once the Attorney General certifies the summary may petitioners begin collecting the approximately 400,000 signatures necessary to put the proposed amendment on the ballot.

Plaintiffs-Appellants ("Plaintiffs") are Ohio voters who, together, seek to amend the Ohio Constitution through a ballot initiative.  Pursuant to Ohio law, Plaintiffs drafted their amendment and summary, collected their one thousand qualified supporting signatures, and filed it with the Ohio Attorney General, David Yost.  On at least six occasions, Yost declined to certify Plaintiffs' summary.  After Yost's most recent decision denying certification, Plaintiffs turned to the Supreme Court of Ohio for review.  When the state supreme court declined to grant expedited review, Plaintiffs filed a complaint in federal district court seeking injunctive relief.  In their complaint, Plaintiffs alleged that Yost's enforcement of Ohio Revised Code § 3519.01 functions as an unconstitutional obstacle to their ballot access and their ability to speak about and advocate for their proposed amendment as they wish, in violation of the First and Fourteenth Amendments.  The district court denied Plaintiffs' motion for preliminary injunctive relief.  For the reasons that follow, we **REVERSE** the district court's order and **GRANT** Plaintiffs' motion for preliminary injunctive relief.  We also **DENY** as moot Plaintiffs' motion for an injunction pending appeal.

## I.  BACKGROUND

### A.  Ohio's Ballot Access Scheme

The Constitution of the State of Ohio reserves to the people the power "to propose amendments to the constitution and to adopt or reject [such amendments] at the polls."  Ohio Const. art. II, § 1.  The Ohio General Assembly may pass laws "to facilitate [the] operation" of citizen-initiated constitutional amendments, but the General Assembly may not "limit[] or restrict[]" the power reserved to the people.  *Id.* art. II, § 1g.  To facilitate the operation of citizen-initiated constitutional amendments—and to administer the right to have those

amendments "adopt[ed] or reject[ed] . . . at the polls," *id.* art. II, § 1, the Ohio General Assembly developed an amendment-initiative process, *see* Ohio Rev. Code § 3519.01.

Ohio law requires that citizens take several steps before they can place a proposed constitutional amendment on the ballot. The individuals proposing the amendment ("petitioners") must first form a committee to "represent them in all matters relating to [their] petitions." *Id.* § 3519.02. Petitioners must then submit the proposed amendment, a summary of the amendment, and 1,000 supporting signatures to the Ohio Attorney General for review. *Id.* § 3519.01(A). "Within ten days after the receipt of the written petition and the summary of it, the attorney general shall conduct an examination of the summary." *Id.* The Attorney General must determine if "the summary is a fair and truthful statement of the proposed . . . constitutional amendment." *Id.* "This factual determination is the extent of the role and authority of the Attorney General." *State ex rel. Barren v. Brown*, 365 N.E.2d 887, 888 (Ohio 1977). If the summary is fair and truthful, the Attorney General "shall so certify," and then forward the petition to the Ohio ballot board for approval. Ohio Rev. Code § 3519.01(A). Following the board's review and approval, *see id.* § 3505.062(A), the proposed amendment again returns to the Attorney General who "shall then file with the secretary of state a verified copy of the proposed . . . constitutional amendment together with its summary and the attorney general's certification," *id.* § 3519.01(A).

Only after the Attorney General files the proposed amendment, summary, and certification with the Secretary of State may petitioners create an "Initiative Petition" and begin collecting signatures in support of the petition. *See id.* § 3519.05; *see also* D. 19 (Appellee Br. at 9). For a proposed amendment to qualify for placement on the ballot, petitioners must collect signatures equaling at least ten percent of the total number of votes cast for governor in the last gubernatorial election. *See State ex rel. DeBlase v. Ohio Ballot Bd.*, 229 N.E.3d 13, 16 (Ohio 2023) (citing Ohio Const. art. II, §§ 1a, 1g). The supporting signatures, moreover, most come from at least forty-four of Ohio's eighty-eight counties. *See id.* Plaintiffs-Appellants allege that this signature requirement—a requirement that they cannot begin working towards until after the Defendant-Appellee Attorney General Yost certifies their summary and amendment—amounts to "more than 400,000 signatures." *See* D. 18 (Appellant Br. at 13).

Once petitioners collect the requisite signatures, they must file those signatures with the Secretary of State. Ohio Const. art. II, § 1a. The Secretary of State must verify the signatures and pass the petition on to the Ohio ballot board; the Ohio ballot board then certifies the ballot language for the proposed constitutional amendment. Ohio Rev. Code § 3505.062(D).

At that point, the Secretary of State will include the proposed amendment on the ballot at the next general election occurring "subsequent to one hundred twenty-five days after the filing of such petition." Ohio Const. art. II, § 1a. Stated otherwise, petitioners must file their petition with the proposed amendment and requisite signatures—plausibly 400,000 signatures here—at least 125 days before the election to get on the ballot.[1] Because the upcoming election is November 5, 2024, Plaintiffs face a July 3, 2024 deadline.

**B. Judicial Review of the Attorney General's Certification Decision**

Under Ohio Revised Code § 3519.01(C), aggrieved parties "may challenge the certification or failure to certify of the attorney general in the [Ohio] supreme court, which shall have exclusive, original jurisdiction in all challenges of those certification decisions." Accordingly, if the Attorney General fails to certify a summary—meaning, that a petitioner's proposed amendment fails at the first step of the ballot-access process—the petitioner can seek judicial review in the Supreme Court of Ohio. *Id.* Section 3519.01(C), however, fails to specify a time period for judicial review. Accordingly, the Supreme Court of Ohio's rules of practice govern.

The Supreme Court of Ohio's rules of practice recognize "the necessity of a prompt disposition of an original action relating to a pending election." Ohio S. Ct. R. Prac. 12.08(A)(1). On that basis, the rules of practice provide for expedited review of election cases "if the action is filed within ninety days prior to the election." *Id.* As the complaint in this case correctly notes, however, "[n]othing in the Ohio Supreme Court's rules of practice require

---

[1]Yost notes that the Secretary of State has until 105 days before the election to determine the sufficiency of the signatures, D. 19 (Appellee Br. at 9) (citing Ohio Rev. Code § 3519.15), and petitioners are allowed ten additional days to file more signatures if needed, *id.* (Appellee Br. at 9–10) (citing Ohio Rev. Code § 3519.16). Yost is correct that the signature verification process may continue beyond 125 days before the election. That does not change the fact, however, that petitioners are required to file their petition and signatures in the first instance at least 125 days before the election. Ohio Const. art. II, § 1a.

expedited proceedings of election challenges that are filed more than 90 days before election day." R. 1 (Compl. ¶ 31) (Page ID #8). Whether to expedite proceedings outside of that ninety-day period is left to the discretion of the state supreme court. *See id.* (Compl. ¶ 32) (Page ID #8).

As explained above, to get a citizen-initiated constitutional amendment on an Ohio ballot, petitioners must (1) form a committee, (2) draft an amendment and summary of the amendment, and collect one thousand supporting signatures. Once the amendment and summary are drafted and a thousand signatures are collected, petitioners must have (3) their summary certified by the Attorney General, (4) their amendment approved by the Ohio ballot board, and (5) their summary and amendment sent by the Attorney General to the Secretary of State. *See supra* Part I, Section A. Only after accomplishing those first five steps may petitioners begin (6) collecting signatures from at least ten percent of voters in prior gubernatorial elections. If petitioners collect the requisite signatures, they must (7) file the petition and signatures with the Secretary of State. The Secretary of State then (8) passes the petition to the Ohio ballot board for approval before, the Secretary of State, finally, (9) shall place the proposed amendment on the ballot at the next general election occurring at least 125 days after receiving the petition and signatures.

Petitioners must necessarily complete the petitioning process—the first seven steps listed above—by 125 days before an election to get their proposed amendment on the ballot. *See* Ohio Const. art. II, § 1a. Accordingly, any challenges to the Attorney General's "failure to certify" a proposed amendment's summary at step three will take place at least 125 days before an election. Ohio Rev. Code § 3519.01(C). The Supreme Court of Ohio's expedited review of election cases "filed within ninety days prior to the election," will thus never apply to challenges to the Attorney General's failure to certify the summaries of citizen-initiated constitutional amendments. Ohio S. Ct. R. Prac. 12.08(A)(1). Instead, petitioners who challenge the Attorney General's "failure to certify" their proposed amendment's summary will never have any guarantee of judicial review in advance of any upcoming election deadlines. Ohio Rev. Code § 3519.01(C).

**C.  Plaintiffs' Citizen-Initiated Constitutional Amendment**

Plaintiffs are Ohio voters and members of an initiative petition committee who, together, seek to amend the Ohio Constitution.  *See* R. 1 (Compl. ¶ 2) (Page ID #1–2).  Following the mandates of Ohio law, as detailed above, Plaintiffs drafted a proposed citizen-initiated constitutional amendment, provided a summary of the proposed amendment, and collected 1,000 qualified signatures in its support.  *See id.* (Compl. Exh. 4 at 1) (Page ID #38).  On March 5, 2024, Plaintiffs submitted their proposed amendment, summary, and qualifying signatures to Yost, the Ohio Attorney General.  *Id.*  On March 14, 2024, Yost rejected Plaintiffs' summary, stating that he was "unable to certify the submitted summary as a fair and truthful representation of the proposed amendment."  *Id.*  Yost provided reasons for his rejection, but because Plaintiffs "do not here challenge the merits of Yost's . . . objections" to their summary, we decline to articulate or analyze those reasons here.  D. 18 (Appellant Br. at 12); *see* D. 19 (Appellee Br. at 11–12).

Yost's March 14, 2024 rejection was nothing new to Plaintiffs.  In February 2023, for example, Plaintiffs filed an earlier version of the "Protecting Ohioans' Constitutional Rights" amendment, summary, and qualifying signatures.  *See* D. 19 (Appellee Br. at 11); R. 1 (Compl. ¶ 34) (Page ID #9).  Yost declined to certify that earlier summary for failure to be fair and truthful.  *See* D. 19 (Appellee Br. at 11).  Prior to March 2024, Plaintiffs submitted their proposed amendment, summary, and a new one thousand qualifying signatures at least six times.  *See id.* (Appellee Br. at 11–12); D. 18 (Appellant Br. at 7–8).  After Plaintiffs' submissions, "Yost reject[ed] each one."  D. 18 (Appellant Br. at 8).

On March 20, 2024, rather than rewriting and collecting a new one thousand signatures, Plaintiffs filed a mandamus action under § 3519.01(C) in the Supreme Court of Ohio, challenging Yost's March 14, 2024 failure to certify their summary.  *See* R. 1 (Compl. ¶ 34) (Page ID #9); D. 18 (Appellant Br. at 14).  That same day, Plaintiffs also moved the Supreme Court of Ohio to expedite proceedings.  R. 1 (Compl. ¶ 36) (Page ID #9).  Yost opposed Plaintiffs' motion to expedite proceedings, and, on March 26, 2024, the court denied expedited review.  *See id.* (Compl. ¶ 39–40) (Page ID #9–10).  Thereafter, Yost filed a motion to dismiss the mandamus, which Plaintiffs opposed.  On May 20, 2024, with Yost's motion to dismiss still

pending and no schedule set for briefing the merits of Plaintiffs' mandamus action, Plaintiffs voluntarily dismissed their state supreme court case without prejudice. *See* D. 21 (Appellant Add'l Citation).

On March 27, 2024, while their mandamus action was still pending before the state supreme court, Plaintiffs filed a complaint seeking declaratory relief, a preliminary injunction, and a temporary restraining order against Yost in federal district court. *See* R. 1 (Compl. ¶ 61) (Page ID #12). In their complaint, Plaintiffs made both facial and as-applied challenges to § 3519.01, arguing that Yost's use of that provision "to block their initiative presented an unconstitutional ballot obstacle under the First and Fourteenth Amendments." D. 18 (Appellant Br. at 17). Plaintiffs further alleged that, "[w]ithout timely, de novo judicial 'redress,'" Yost's enforcement of § 3519.01 functions as "an unreviewed and unreviewable executive obstacle in their path to Ohio's ballot," *id.*, and an "unconstitutional obstacle" blocking their ability to speak about and advocate for their proposed amendment in the way they wish, *see id.* (Appellant Br. at 42, 44).

The district court denied Plaintiffs' motion for a preliminary injunction and a temporary restraining order. R. 21 (D. Ct. Op.). The district court first found that neither the Eleventh Amendment nor principles of abstention barred Plaintiffs' claims. *Id.* (D. Ct. Op. at 4–7) (Page ID #206–09). Nonetheless, the district court found that, because Plaintiffs failed to demonstrate that their injury was fairly traceable to Yost's actions, Plaintiffs had "not shown [that] they are substantially likely to establish standing." *Id.* (D. Ct. Op. at 10) (Page ID #212). The district court additionally found that neither Plaintiffs' facial nor as-applied claims were likely to succeed on the merits. *Id.* (D. Ct. Op. at 15, 19) (Page ID #217, 221).

Plaintiffs filed a timely notice of appeal and a motion for injunction pending appeal in the district court. R. 23 (Notice of Appeal); R. 24 (Mot. for Inj. Pending Appeal). The district court denied the motion for injunction pending appeal. *See* R. 26 (D. Ct. Order at 2) (Page ID #251). Plaintiffs additionally moved this court for an injunction pending appeal or, in the alternative, expedited briefing. *See* D. 5 (Mot. for Inj. Pending Appeal). On May 2, 2024, we ordered expedited briefing and reserved judgment on Plaintiffs' motion for an injunction pending appeal. *See* D. 16 (Expedited Briefing Order).

## II.  ANALYSIS

Plaintiffs seek injunctive relief enjoining Yost from enforcing § 3519.01 to block their proposed citizen-initiated constitutional amendment.  D. 18 (Appellant Br. at 2).  Plaintiffs argue that Yost's enforcement of Ohio's ballot-initiative process, as codified in § 3519.01, unconstitutionally restricts their ability to speak and advocate for their proposed constitutional amendment and limits their ballot access, in violation of the First and Fourteenth Amendments.

### A.  Standard of Review

In considering a motion for a preliminary injunction, a court must weigh four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction."  *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012).  These "considerations are 'factors to be balanced, not prerequisites that must be met.'"  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003)).  That said, in First Amendment cases, like this one, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits."  *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020) (quoting *Bays*, 668 F.3d at 819).

We review a district court's decision to deny a preliminary injunction—and its weighing of the above four factors—for an "abuse of discretion, subjecting factual findings to clear-error review and examining legal conclusions de novo."  *Id.*  Both standing and Eleventh Amendment immunity are legal conclusions that we review de novo.  *See Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019); *Block v. Canepa*, 74 F.4th 400, 407 (6th Cir. 2023).

### B.  Likelihood of Success on the Merits

#### 1.  Standing

The district court found that Plaintiffs did not have a strong likelihood of success on the merits because Plaintiffs were not "substantially likely to establish standing."  R. 21 (D. Ct. Op.

at 10) (Page ID #212). The district court specifically found that Plaintiffs' injury was not fairly traceable to Yost's actions. *Id.* (D. Ct. Op. at 8–10) (Page ID #210–12). According to the district court, the Attorney General "has no authority over the availability of expedited judicial review of plaintiffs' mandamus action." *Id.* (D. Ct. Op. at 8) (Page ID #210). Instead, "[i]t is the Ohio legislature" that wrote the law and the Supreme Court of Ohio who decides "if it will review plaintiffs' action in expedited and de novo fashion." *Id.* On that basis, the district court found that Plaintiffs' alleged injury is traceable to those third parties, not to the Attorney General.

A plaintiff has standing if (1) they "suffered an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'"; (2) their "injury is 'fairly traceable to the challenged action of the defendant'; and (3) it is likely 'that the injury will be redressed by a favorable decision.'" *Mosley*, 942 F.3d at 756 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Contrary to the district court's analysis, Plaintiffs have standing here.

It is undisputed that Plaintiffs suffer an "injury in fact." *See* D. 19 (Appellee Br. at 18–20) (arguing against standing only on redressability and traceability grounds); D. 18 (Appellant Br. at 29). Plaintiffs allege that their First and Fourteenth Amendment right to political speech is burdened by Yost's enforcement of § 3519.01 without the availability of timely review. That is, they argue Yost's certification decision *itself* unduly burdens their right to political expression when § 3519.01 gave him the authority to make that decision with inadequate means for challenging it. In this context, Plaintiffs are prohibited from advocating for their proposed amendment in the way they wish, thus undermining their freedom of "expression of a desire for political change and" their ability to discuss "the merits of the proposed change." *Meyer v. Grant*, 486 U.S. 414, 421 (1988). The dissent suggests that Plaintiffs do not have an injury in fact because, without a complaint for a writ of mandamus before the Supreme Court of Ohio or a new summary before Yost, Plaintiffs face "no 'actual present harm.'" Dissent at 38 (quoting *Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). Contrary to our dissenting colleague's conclusion, however, Plaintiffs' inability to advocate for and speak about the proposed amendment how they wish is a "continuing, present adverse effect[]." *Id.* at 37

(quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).   Such an allegation of an ongoing injury—a barrier continuously preventing their speech—supports Article III standing.[2]

Plaintiffs' injury would also likely be redressed by a favorable decision.   As noted above, Plaintiffs are asking this court to enjoin the enforcement of § 3519.01.   Plaintiffs' injury—their inability to advocate for and speak on the proposed amendment in the way they wish—is "redressable by a favorable decision holding the law[] . . . unconstitutional as applied and allowing" them to express their support and advocate for their proposed amendment as they wish.[3]   *Graveline v. Benson*, 992 F.3d 524, 532 (6th Cir. 2021).   Stated otherwise, a decision enjoining Yost's authority to decide whether or not to certify Plaintiffs' summary would lift the burden on Plaintiffs' speech.

Yost argues that "[i]t is . . . impossible for this Court to provide effective relief to [Plaintiffs] by ordering the Attorney General to do anything with respect to [their] ballot initiative," because control over that initiative "now lies exclusively in the hands of the Supreme Court of Ohio and [Plaintiffs] themselves."   D. 19 (Appellee Br. at 18).   This court, Yost asserts, accordingly, "cannot redress [Plaintiffs'] alleged injuries through the relief sought."   *Id.* (Appellee Br. at 19).   Yost's redressability argument, however, misconstrues the relief that Plaintiffs seek.   Yost construes Plaintiffs' request for injunctive relief as a backwards looking attempt to alter his March 2024 certification decision.   In contrast to that construction, Plaintiffs seek injunctive relief preventing Yost from enforcing § 3519.01 against them—enjoining Yost's authority to certify, or fail to certify, their summary generally.   In Plaintiffs' view, Yost's

---

[2]The dissent suggests that "Plaintiffs do not allege that Yost has done anything to deny" their ability to advocate for and speak about their proposed constitutional amendment how they wish.   Dissent at 39. This is, plainly, false.   *See, e.g.*, D. 18 (Appellant Br. at 42) ("The assumption that forcing citizen-initiative sponsors to re-write their summaries and proposed amendments causes no First Amendment harm is also wrong. Doing so not only takes valuable time, which causes First Amendment harm, but also forces speakers to change their messages."). Moreover, the dissent argues that Plaintiffs do not have an injury because they "do not allege, for example, that they have been prevented from advocating in the news media, through social media, and in person for voters to support the proposed amendment."   Dissent at 39.   This argument—that there is no injury because alternate avenues of expression remain open—has been expressly rejected by the Supreme Court.   *See Grant*, 486 U.S. at 424 ("That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection.").

[3]We need not address Plaintiffs' standing to bring a facial challenge to § 3519.01.   Because our holding is based on Plaintiffs' as-applied challenge, *see infra* Part II, Section B.3, we decline to address both standing and the merits of Plaintiffs' facial challenge.

enforcement restricts their speech and advocacy about the proposed amendment on an ongoing basis. *See* D. 18 (Appellant Br. at 2); *id.* (Appellant Br. at 20–21) ("Yost has repeatedly blocked Appellants' proposed initiative . . . thus caus[ing] Appellants continuing constitutional injury, and restraining his action will redress that injury by allowing them to continue to take the needed steps under Ohio law to place their proposed amendment on Ohio's November 5, 2024 ballot.").

Yost, not the Supreme Court of Ohio, is responsible for enforcing that statutory provision. *See* Ohio Rev. Code § 3519.01(A) ("[T]he attorney general shall conduct an examination of the summary . . . [and] so certify and then forward the submitted petition to the Ohio ballot board. . . ."). Yost's ongoing enforcement of that statutory provision alone stands as an obstacle to Plaintiffs' ability to advocate for their constitutional amendment in the way they wish and to continue the process of circulating the petition and getting their proposed amendment on the Ohio ballot. *See* D. 18 (Appellant Br. at 44); D. 19 (Appellee Br. at 8–9) (explaining that petitioners may begin collecting signatures only after the Attorney General "files a verified copy of the amendment, together with its certified summary, with the Secretary of State"); Ohio Rev. Code § 3519.05. An injunction preventing that obstacle—Yost's enforcement of § 3519.01 against Plaintiffs—would accordingly redress their injury.

Plaintiffs' injury is also fairly traceable to Yost. To establish traceability, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "Beyond that threshold, however, the plaintiff's burden of alleging that their injury is fairly traceable to the defendant's challenged conduct is relatively modest. Any harm flowing from the defendant's conduct, even indirectly, is said to be fairly traceable." *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 592 (6th Cir. 2022) (quotation omitted).

As noted above, when a petitioner "seeks to propose a . . . constitutional amendment by initiative," they must "submit the proposed . . . constitutional amendment and a summary of it to the attorney general for examination." Ohio Rev. Code § 3519.01(A). The Attorney General is then tasked with determining whether "the summary is a fair and truthful statement of the . . .

constitutional amendment." *Id.* Only if the Attorney General certifies the summary may the proposed amendment move to the next steps in the process, specifically gathering signatures through interactive communication with voters. *See supra* Part I, Section A (describing the process). Stated otherwise, only if the Attorney General certifies the summary may the petitioners advocate for their political position and seek out signatures in support thereof. If a petitioner is aggrieved by the Attorney General's failure to certify their summary and amendment, the Attorney General is the source of their grievance and the proper defendant. *See* Ohio Rev. Code § 3519.01(C) (granting aggrieved parties the right to challenge the Attorney General's decision). The Attorney General, Yost, is *the* executive officer enforcing this provision against Plaintiffs, and thus the cause of Plaintiffs' alleged injury.

Yost argues that Plaintiffs' "alleged harm—an inability to get on the November 2024 ballot—is not traceable to the Attorney General because there are multiple intervening steps to get onto the ballot that are controlled by other actors not before the Court." D. 19 (Appellee Br. at 19). Yost's traceability argument again misconstrues Plaintiffs' alleged injury and the remedies they seek. Plaintiffs allege that they are injured by an "unconstitutional obstacle" that blocks access to the Ohio ballot and prohibits them from advocating for and speaking on their proposed amendment in the way they wish; Plaintiffs seek an injunction enjoining the enforcement of that obstacle. D. 18 (Appellant Br. at 42, 44); *see also* D. 20 (Appellant Reply Br. at 18). In contrast to what Yost would have this court believe, Plaintiffs' injury is not their failure to get on the Ohio ballot. *See* D. 20 (Appellant Reply Br. at 18) ("[Plaintiffs'] have requested very narrow prospective relief removing the lone unconstitutional obstacle – Yost's unilateral and unreviewable decision – from their path. [Plaintiffs] have not asked to be placed on the ballot."). Rather, Plaintiffs' injury is their inability to advocate for and speak on the proposed amendment in the way they wish because of an allegedly "unconstitutional obstacle" standing in their path. *Id.*; D. 18 (Appellant Br. at 42, 44). Yost is correct that, zoomed out, many third parties—voters who may or may not sign a petition, the Secretary of State, and the Ohio ballot board—are involved in whether Plaintiffs' proposed amendment ultimately gets on the ballot. Those third parties, however, have no role in whether the alleged "unconstitutional obstacle," i.e., the enforcement of § 3519.01, is enforced against Plaintiffs. D. 18 (Appellant Br.

at 42, 44); D. 20 (Appellant Reply Br. at 18).  The harm caused by § 3519.01, and the alleged burden on Plaintiffs' speech, is directly traceable to Yost.[4]

As our sibling circuit has explained, "it appears to be standard operating procedure for plaintiffs to bring these types of suits against the officials who administer the state election system, which here includes the" Attorney General.  *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 367 (3d Cir. 2014).  In ballot-access cases, it is always true that petitioners might ultimately fail to get enough signatures—or in election cases, enough votes—to accomplish their ultimate goal.  That a petitioner might not ultimately get on the ballot, however, does not mean that an unconstitutional barrier to their speech advocating for a ballot initiative is not fairly traceable to the executive official enforcing that barrier.  *See id.* at 366–67.  The harm caused by the enforcement of a statute is fairly traceable to the executive officer doing the enforcing.  *See, e.g.*, *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1049–50 (6th Cir. 2015); *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 310 (5th Cir. 2023) (holding that "harm is directly traceable to the UNT officials[] wrongfully enforcing" the provision); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) (explaining that harm is fairly traceable and the court "may enjoin executive officials from taking steps to enforce a statute . . . when the officials who enforce the challenged statute are properly made parties to a suit" (quotation omitted)); *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1174 (9th Cir. 2018) (holding that the plaintiff's injury was fairly traceable to the state attorney general who enforces the law).  Here, the alleged injury caused by the enforcement of § 3519.01 is fairly traceable to Yost.  Therefore, Plaintiffs are likely to succeed in showing that they have standing to bring their First Amendment claims.

---

[4]Whereas Yost erroneously argues that Plaintiffs' injury is traceable to third parties such as voters, the dissent suggests that Plaintiffs' injury is traceable only to the Supreme Court of Ohio.  *See* Dissent at 39–40.  Such a traceability analysis, however, misstates Plaintiffs' injury.  Plaintiffs' injury is their inability to advocate for their constitutional amendment in the way they wish.  The limit on their advocacy is *caused by* Yost's enforcement of § 3519.01 itself.  The state supreme court's review of that decision—or absence thereof—is secondary to the Attorney General's enforcement.  Stated otherwise, judicial review would not be at issue but for the Attorney General's enforcement of § 3519.01 against Plaintiffs.  Plaintiffs' alleged First Amendment injury is thus directly traceable to Yost.

**2. Eleventh Amendment**

Sovereign immunity, as embodied in the Eleventh Amendment, generally protects states and state officials from suit for money damages in federal court. *Boler v. Earley*, 865 F.3d 391, 409–10 (6th Cir. 2017). There are, however, three exceptions to sovereign immunity. *See id.* Relevant here, a court retains "subject-matter jurisdiction to hear a constitutional claim against an official acting under color of state law if the claim fits within the exception of *Ex parte Young*, 209 U.S. 123 (1908)." *Morgan v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 515 (6th Cir. 2023). The *Ex parte Young* exception "allows plaintiffs to bring claims for prospective relief against state officials sued in their official capacity to prevent future federal constitutional or statutory violations." *Boler*, 865 F.3d at 412. The exception, however, does not permit claims for retrospective relief. *Id.* The "straightforward inquiry" used to determine if the *Ex parte Young* exception applies is, therefore, "whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."[5] *Id.* (alteration in original) (quoting *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003)).

Yost argues that Plaintiffs' requested relief is retrospective in nature—a request "to undo the Attorney General's prior certification denial"—and therefore outside the *Ex parte Young* exception and barred by the Eleventh Amendment. D. 19 (Appellee Br. at 21). Plaintiffs, however, repeatedly affirm that they "do not seek to reverse Yost's decision." D. 18 (Appellant Br. at 44); *see also* D. 15 (Appellant Reply Br. Mot. Pending App. at 6). Plaintiffs instead allege that Yost's ongoing enforcement of § 3519.01 against them—his ongoing exercise of authority to decline to certify their summary—continuously violates their First Amendment rights. Plaintiffs accordingly seek a prospective injunction prohibiting Yost from enforcing § 3519.01 against them—enjoining his authority to make a certification decision without timely judicial review—moving forward. *See* D. 18 (Appellant Br. at 42, 44); D. 20 (Appellant Reply Br. at 5).

---

[5]The dissent would hold that sovereign immunity bars Plaintiffs claims not because the complaint fails to allege an ongoing violation of federal law nor because it is retrospective, but rather because "prospective injunctive relief against Yost would do nothing to remedy the alleged constitutional violation." Dissent at 42. Such analysis, however, is better suited for the redressability inquiry, *supra*, and does not undermine the applicability of *Ex parte Young*.

Two cases inform our inquiry into whether Plaintiffs allege an ongoing violation of federal law. In *League of Women Voters of Ohio v. Brunner*, plaintiffs alleged that "Ohio's election machinery unconstitutionally denies or burdens Ohioans' right to vote based on where they live in violation of the Equal Protection Clause." 548 F.3d 463, 475 (6th Cir. 2008). State-official defendants in that case, however, argued that the plaintiffs failed to allege ongoing constitutional violations because any alleged violations already occurred—during a previous election—and the plaintiffs showed no "reasonable basis to believe the violations will occur in the future." *Id.* at 474–75. The defendants thus argued that the *Ex parte Young* exception did not apply. *Id.* We held that the state-official defendants were not protected by sovereign immunity. *Id.* at 475. We explained that, though the initial allegedly harmful actions may have already occurred, *id.* at 466–69, plausible allegations that the "problems [were] chronic and [would] continue absent injunctive relief," demonstrated ongoing constitutional harm, *id.* at 475. Likewise, in *Boler*, a group of plaintiffs sought an injunction directing a defendant state official to provide services to the plaintiffs affected by the Flint water crisis. 865 F.3d at 413. That state-official defendant argued that the plaintiffs did not show any ongoing violation of their constitutional rights because the damage had already been done and the deficient-water pipes had already been fixed. *Id.* We held that the defendant's argument "takes too narrow a view of the ongoing constitutional violations that the Plaintiffs allege." *Id.* Though the initial violation— bad water pipes—had already taken place, the constitutional harm—violations to their bodily integrity—was ongoing. *Id.*; *accord In re Flint Water Cases*, 960 F.3d 303, 334 (6th Cir. 2020) (finding injunctive relief under *Ex parte Young* was appropriate not because the plaintiffs alleged Michigan's governor would violate their rights "again in the future, but because" they alleged the past violation "has continuing effects" (quotations omitted)).

Here, Plaintiffs' alleged constitutional injury, like the injuries in *League of Women Voters* and *Boler*, is ongoing. Plaintiffs plausibly allege that their inability to speak and advocate for their proposed constitutional amendment in the way they wish is a continuing harm. *See* D. 20 (Appellant Reply Br. at 5) (arguing "that past actions [are] causing ongoing constitutional injuries"). That this alleged constitutional injury began with past action—here, Yost's previous multiple failures to certify the summaries to their proposed constitutional amendment—does not undermine the continuing constitutional violation and harmful effects. Like in *League of Women*

*Voters*, Plaintiffs faced this constitutional harm in a past election, *see* D. 19 (Appellee Br. at 11) (noting that Plaintiffs submitted summaries—and Yost rejected those summaries—during this and the prior election cycle), face it in the current election cycle, *see id.*, and plausibly allege that the constitutional "problems are chronic and will continue absent injunctive relief," *League of Women Voters*, 548 F.3d at 475.

Plaintiffs not only allege an ongoing violation of federal law; they also seek "relief properly characterized as prospective." *Boler*, 865 F.3d at 412 (quoting *Dubuc*, 342 F.3d at 616). As described in detail above, *see supra* Part II, Section B.1, Plaintiffs seek injunctive relief preventing Yost from enforcing § 3519.01 against them, *see* D. 18 (Appellant Br. at 20–21). Plaintiffs' sought-after relief, when properly construed, asks this court to prevent Yost from enforcing a law moving forward. That relief is properly characterized as prospective. *See Russell*, 784 F.3d at 1047–48. Enjoining the enforcement of this statute as applied to Plaintiffs is prospective relief; Plaintiffs have thus shown that they are likely to succeed in demonstrating that their claims are not barred by sovereign immunity.

### 3. Constitutionality of Ohio Revised Code § 3519.01

Because Plaintiffs have shown that they likely have standing to bring their claims and are likely not barred by sovereign immunity, we next turn to the merits of their claims. As an initial matter, we must first clarify the legal tests that apply to Plaintiffs' First Amendment challenge. Recently, this court outlined the categories of First Amendment claims that a plaintiff may make in the election-administration context. *See Lichtenstein v. Hargett*, 83 F.4th 575, 583 (6th Cir. 2023) (identifying *Grant*, *Anderson-Burdick*, and *United States v. O'Brien* for election-related claims). In *Lichtenstein*, we explained that laws that target political speech fall under *Grant*, laws that target political association or voting fall under *Anderson-Burdick*, and laws that target expressive conduct fall under *O'Brien*. *Id.* at 583, 589–90, 594. Here, both parties blend the *Grant* and *Anderson-Burdick* tests into a hybrid analysis. Neither party's briefing—before this court or before the district court—however, is a model of clarity. We therefore begin by disentangling the relevant legal context. Because neither party invokes *O'Brien* as the relevant test, we focus on *Grant* and *Anderson-Burdick*.

Typically, when determining whether a state election law violates a plaintiff's rights under the First and Fourteenth Amendments, we apply the framework set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).[6]  The *Anderson-Burdick* framework requires us to weigh the "character and magnitude of the asserted injury" against the "precise interests put forward by the State as justifications for the burden imposed by its rule."  *Anderson*, 460 U.S. at 789.  The level of scrutiny we apply is determined by the magnitude of the burden.  If the burden is severe, the regulation will be upheld only if it is "narrowly drawn to advance a state interest of compelling importance."  *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).  If the regulations are minimally burdensome, the state's regulatory interests will likely justify "reasonable, nondiscriminatory restrictions."  *Anderson*, 460 U.S. at 788.  Many regulations fall somewhere between these two extremes.  When a regulation imposes an intermediate burden, "courts engage in a flexible analysis, weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it."  *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014).

In addition to the traditional *Anderson-Burdick* analysis, if an election law impacts—directly or indirectly—"core political speech," then that law may be challenged under *Grant*, *Buckley v. Am. Const. L. Found.*, 525 U.S. 182 (1999), and their progeny.  *See Lichtenstein*, 83 F.4th at 584–86.  For such a law, strict scrutiny is triggered.  *Id.* at 585–86 (explaining that "'speech through petition circulators[ ]' . . . garner[s] the First Amendment's highest protections" (quoting *Grant*, 486 U.S. at 422, 424)); *see also Schmitt v. LaRose*, 933 F.3d 628, 645 (6th Cir. 2019) (Bush, J., concurring in part) (explaining that a state statute that is "directed toward the challengers' ability to advocate for their initiative" is subject to "strict scrutiny review under the Supreme Court's precedent in" *Grant*).

---

[6]In his briefing before the district court, R. 14 (Opp'n to Mot. for Prelim. Inj. at 14–18) (Page ID #100–04), and this court, D. 19 (Appellee Br. at 27–28), Yost contends that the *Anderson-Burdick* framework is inappropriate in this context and preserves that argument for a future appeal or rehearing.  For the reasons outlined below, binding precedent—including Supreme Court precedent—make this case an inapt vehicle for such an argument.  *See infra* Part II, Section B.3.

In some instances, a claim may cross over the clear boundaries outlined in *Lichtenstein*, 83 F.4th at 583. For example, in several earlier challenges to initiative procedures, we have considered the burden on "core political speech," as defined in *Grant*, within the first step of the *Anderson-Burdick* test. *See Citizens for Tax Reform v. Deters*, 518 F.3d 375, 380–87 (6th Cir. 2008) (considering the "character and magnitude" of the state's law allowing only per-time payment of petition circulators under *Anderson-Burdick* and in light of *Grant* and its progeny); *Hawkins v. DeWine*, 968 F.3d 603, 606–07 (6th Cir. 2020) (finding that the initiative-ballot-access requirements, in combination with the state's COVID-19 orders, had an intermediate burden under *Anderson-Burdick* because the COVID-19 orders "exempt[ed] First Amendment protected speech," including the speech associated with "collecting signatures for ballot access," as defined in *Grant*).[7] The claims at issue in those cases—like Plaintiffs' claims here— necessarily involved speech (*Grant*) *and* voting or association (*Anderson-Burdick*). *Cf. Lichtenstein*, 83 F.4th at 583 (considering cases falling within the *Grant* category to be expression or speech cases); *id.* at 589–90 (considering ballot access cases—both candidate and ballot initiative claims—to fall within the *Anderson-Burdick* framework because they involve voting or political association). This case falls within this hybrid category and, therefore, we apply the *Anderson-Burdick* test and assess whether the law impacts Plaintiffs' core political speech, as defined in *Grant*, when determining the character and magnitude of Plaintiffs' injury.[8]

With this background, we first address the character and magnitude of the injury, and then we weigh the injury against the state's interests under the applicable level of scrutiny. Although Plaintiffs' challenge is both facial and as-applied, we focus on the as-applied challenge because it is dispositive.

---

[7]In *American Constitutional Law Foundation*, at least seven members of the Court—albeit some with more clarity than others—agreed that the "core political speech" analysis from *Grant* can be done within the *Anderson-Burdick* framework. 525 U.S. at 193–95 (citing the aspect of *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997), that explains the *Anderson-Burdick* test and considering the severity of the burden that the Colorado statute placed on gathering signatures in light of *Grant*); *id.* at 206–07 (Thomas, J., concurring in judgment) (citing the *Anderson-Burdick* framework and considering whether "core political speech" was severely burdened under *Grant*); *id.* at 216–17 (O'Connor, J., concurring in judgment in part and dissenting in part) (same).

[8]The dissent contends that there is a distinction between cases that trigger *Grant* and cases that trigger *Anderson-Burdick*. On this point, as explained, we agree. *See Lichtenstein*, 84 F.4th at 583. To the extent, however, that the dissent suggests that there are no cases in which both *Grant* and *Anderson-Burdick* apply, it conflicts with binding precedent. *See, e.g.*, *Citizens for Tax Reform*, 518 F.3d at 380–87.

### a. Character and Magnitude of Plaintiffs' Asserted Injury

Our first step under the *Anderson-Burdick* framework is to determine the character and magnitude of Plaintiffs' injury. When determining the character and magnitude of Plaintiffs' injury, we must consider "the combined effect of the applicable election regulations," and not measure the effect of each statute in isolation. *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006); *accord Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 575 (6th Cir. 2016) ("In some circumstances, the combined effect of ballot-access restrictions can pose a severe burden." (quotations omitted)). States have the "power to ban initiatives"; however, if initiatives are allowed under state law, states do not have "the power to limit discussion of political issues raised in initiative petitions." *Grant*, 486 U.S. at 425; *see also Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir. 1993) ("[W]e conclude that although the Constitution does not require a state to create an initiative procedure, if it creates such a procedure, the state cannot place restrictions on its use that violate the federal Constitution.").

The Supreme Court has further explained that "[t]he circulation of an initiative petition" *necessarily* "involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Grant*, 486 U.S. at 421. Characterizing this as "core political speech," the Court has held that restrictions on initiative proponents' ability to advocate for a petition to obtain signatures are "wholly at odds with the guarantees of the First Amendment." *Id.* at 421–22, 428; *Am. Const. L. Found.*, 525 U.S. at 199. This is because "the First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)); *see also Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 185 (6th Cir. 2008) ("Speech advocating a campaign to affect government policy is the essence of protected, political speech.").

Although "[s]tates allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process," *Am. Const. L. Found.*, 525 U.S. at 191, speech related to "[p]etition circulation . . . is 'core political speech'" subject to heightened protections "because it involves 'interactive communication concerning political change,'" *id.* at 186 (quoting *Grant*, 486 U.S. at 422); *see also Hawkins*, 968 F.3d at 607 ("[I]t is well-established

that the act of collecting signatures for ballot access falls under [the First Amendment's protections].").  In this context, "[t]he First Amendment protects [plaintiffs'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."  *Grant*, 486 U.S. at 424.[9]  "First Amendment protection for such interact[ive communication] . . . is 'at its zenith.'"  *Am. Const. L. Found.*, 525 U.S. at 187 (quoting *Grant*, 486 U.S. at 425).

In *Grant*, the Court found that the appellees' "core political speech" was impacted by the state's "refusal to permit appellees to pay petition circulators."  486 U.S. at 422.  That prohibition "restrict[ed] political expression" because the law "limit[ed] the number of voices who [would] convey appellees' message and the hours they [could] speak," and thereby "limit[ed] the size of the audience they [could] reach."  *Id.* at 422–23.  Likewise, the Court determined that the state law burdened the appellees' "core political speech" because the law "ma[de] it less likely that appellees w[ould] garner the number of signatures necessary to place the matter on the ballot," such that the appellees were unable to "make the matter the focus of statewide discussion."  *Id.*  Here, Plaintiffs' summary of their proposed constitutional amendment "involves both the expression of a desire for political change and a discussion of the merits of the proposed change" and, as explained below, Ohio's restrictions implicate the same concerns at issue in *Grant*.  *Id.* at 421.[10]

---

[9]The dissent suggests, without citation, that *Grant* was concerned with "regulations affecting *who* makes the political speech," as opposed to regulations that impact "*how* political speech is reviewed."  Dissent at 44.  This is a fundamental misreading of *Grant*.  The Court in *Grant* was instead concerned with regulations that impact core political speech, which is defined as speech that "involves 'interactive communication concerning political change.'"  *Am. Const. L. Found.*, 525 U.S. 186 (quoting *Grant*, 486 U.S. at 422).  No aspect of *Grant* reasons that heightened scrutiny is triggered because the regulation targeted "speakers or a class of speakers."  Dissent at 44; *see also Schmitt*, 933 F.3d at 644 (Bush, J., concurring) (explaining that the statute in *Grant* triggered and failed strict scrutiny because the statute "targeted [petitioners'] ability to advocate for initiative petitions, which amounted to regulation of political speech").

[10]Even if the dissent's proposed mutually exclusive categories were apt, *see supra* n.8, its analysis misses the mark.  In the dissent's view, *Grant* is inapplicable to "challenges to election mechanics."  Dissent at 44.  Section 3519.01, however, is not an election-mechanics regulation because, as explained in the remainder of this subsection, Ohio's scheme for screening *summaries* of ballot initiatives regulates Plaintiffs' ability to advocate for a ballot initiative.  *Cf. Schmitt*, 933 F.3d at 643 (Bush, J., concurring) (explaining that a statute that "regulate[s] a citizen's ability to advocate for a proposed initiative or regulate[s] any speech surrounding the issue on the ballot" is not an election mechanics regulation).  Indeed, this is precisely the type of regulation that triggers application of *Grant*.  As the Supreme Court explained, the prohibition of payment to petition circulators triggered heightened First Amendment scrutiny in *Grant* in part because the regulation impacted "appellees' right not only to advocate their

The Supreme Court has thus identified at least two ways that restrictions on "core political speech" impose a severe burden: (1) by restricting one-on-one communication between petition circulators and potential signatories, and (2) by making it less likely that initiative proponents will be able to garner the necessary signatures to be placed on the ballot "thus limiting their ability to make the matter the focus of statewide discussion." *Grant*, 486 U.S. at 422–23; *cf. Taxpayers United*, 994 F.3d at 297 (explaining that the Michigan law at issue, unlike *Grant*, did "not restrict the means that the plaintiffs can use to advocate their proposal" and that the "result would be different if, as in *Grant*, the plaintiffs were challenging a restriction on their ability to communicate with other voters about proposed legislation"). Both burdens are implicated in this case.

Under Ohio Revised Code § 3519.01, the Attorney General is empowered to review the *substance* of Plaintiffs' *summary* of their proposed constitutional amendment. If Yost determines that the summary is misleading, he declines to certify the summary and the petitioner must begin the process again, presumably by altering the summary to fix the identified errors, as Plaintiffs have done here multiple times. *See id.* § 3519.01(A). Alternatively, the petitioner can file a mandamus action in the Supreme Court of Ohio, contesting the merits of the Attorney General's denial, albeit not on a mandatory-expedited basis. *Id.* § 3519.01(C); *see also supra* Part I, Section A.1.

Once certified, the petitioners have until 125 days before the election to gather approximately 400,000 signatures; in this case, Plaintiffs' deadline is July 3, 2024. The summary of the proposed amendment plays an important role in how Plaintiffs will speak about the amendment while gathering signatures because the summary is required to be placed on the petition. *See* Ohio Rev. Code § 3519.05(A). Thus, it is one of the first things that potential signatories will see when they review the form as they consider whether to sign the petition.

---

cause *but also to select what they believe to be the most effective means for so doing.*" 486 U.S. at 424 (emphasis added). Here, too, the statute burdens Plaintiffs' choice of speech when advocating on behalf of the proposed amendment. The dissent makes no effort to explain how § 3519.01, which allows Yost to reject repeatedly Plaintiffs' summary such that they must rewrite the summary, does not impact their ability to advocate for their proposed amendment. Nor is there any such explanation. The summary is the first thing potential voters see, it is included on the initiative petition, and it necessarily frames how petition circulators discuss the proposed amendment with potential signatories.

*See id.* (depicting the form of the petition for constitutional amendment). And even Yost acknowledges that the summaries may "influence not only whether voters support the petition, but also whether they vote for it on election day." D. 19 (Appellee Br. at 6).

Yost's enforcement of § 3519.01 against Plaintiffs has caused them to alter their proposed summary. For example, Yost declined to certify Plaintiffs' November 2023 summary because it did not explain that the amendment applies to immunities or defenses available to government actors or "any subset thereof." R. 1 (Compl. Ex. 2 at 5) (Page ID #29). In response, Plaintiffs included the "any subset thereof" language in their March 2024 submission, among other changes. *Compare* R. 1 (Compl. Ex. 1 at 1) (Page ID #19), *with* R. 1 (Compl. Ex. 3 at 1) (Page ID #32). Yost rejected Plaintiffs' March 2024 submission, in part, because, in his view, Plaintiffs added the "any subset thereof" language to the wrong aspect of the summary. *See* R. 1 (Compl. Ex. 4 at 1–2) (Page ID #38–40). Because timely review has not been available, Plaintiffs were faced with the decision of whether to wait for the Supreme Court of Ohio to review the merits of their claim, thereby risking that they would run out of time to meet the July 3, 2024 deadline, or change their political speech yet again. As of May 20, 2024, with the July 3 deadline only forty-four days away, the Supreme Court of Ohio had not yet set a briefing schedule to address the merits of Plaintiffs' claims. Timely state court review, accordingly, has been functionally closed to Plaintiffs, thus limiting their options even further.[11]

Because the enforcement of Ohio's statute requires Plaintiffs to change their summary without any review of Yost's decision making, it operates as a "restriction on [Plaintiffs'] ability to communicate with other voters about proposed legislation." *Taxpayers United*, 994 F.3d at 297. This is particularly true in light of the facts of this case—the impending July 3 deadline, the state supreme court's denial of expedited review, and Plaintiffs' multiple attempts to comply with Yost's rejections. Unlike in *Lichtenstein*, where "nothing in [the state law] in any way

---

[11]The dissent suggests, without a single citation to a supporting legal authority, that Plaintiffs' as-applied challenge is moot because they voluntarily dismissed their mandamus action. Dissent at 42. As already explained, timely state court review is functionally unavailable to Plaintiffs under the circumstances of this case. *See State ex rel. Dudley v. Yost*, No. 2024-0161 (Ohio Sup. Ct.) (analogous case in which a fully briefed motion to dismiss was pending for approximately two and a half months); Ohio Const. art. II, § 1a (imposing a signature-collection deadline of 125-days before the upcoming election). Plaintiffs' speech remains burdened; their as-applied claim is thus not moot.

restrict[ed] the Plaintiffs' actual oral or written speech about the 'benefits' of absentee voting," 83 F.4th at 586, section 3519.01 does just that.  Yost's repeated failure to certify Plaintiffs' summaries has forced them to rewrite that summary multiple times, *changing* the way Plaintiffs will be able to speak about their proposed constitutional amendment.  Put differently, Yost's unreviewable discretion in this instance puts Plaintiffs in the position of altering their petition summary, which "involves both the expression of a desire for political change and a discussion of the merits of the proposed change."  *Grant*, 486 U.S. at 421.  This constitutes a severe burden on Plaintiffs' ability to advocate for their initiative because it restricts one-on-one communication between Plaintiffs and potential voters.

Likewise, the second concern from *Grant*—that Plaintiffs will be less able to garner the necessary signatures to be placed on the ballot "thus limiting their ability to make the matter the focus of statewide discussion," 486 U.S. at 423—is also present here.  Without timely review, § 3519.01 allows the Attorney General to reject a summary in perpetuity such that the petitioners are never able to *begin* collecting signatures in support, much less garner the number of signatories required.  Thus, the time that Plaintiffs will have to speak with potential signatories about the proposed amendment as well as how widely they can convey the message has been meaningfully diminished, if not altogether eliminated.  Accordingly, § 3519.01 imposes a severe burden on Plaintiffs' "core political speech" because it is less likely that Plaintiffs will be able to garner the necessary signatures to be placed on the ballot "thus limiting their ability to make the matter the focus of statewide discussion."  *Grant*, 486 U.S. at 423.

In light of this, the district court abused its discretion when it found—relying primarily on *Schmitt*—that § 3519.01 placed only an intermediate burden on Plaintiffs' First Amendment rights.  R. 21 (D. Ct. Order at 12–14, 19) (Page ID #214–16, 221).  The regulations at issue in *Schmitt* were Ohio laws regulating municipal-ordinance initiatives.  933 F.3d at 634–35.  The laws at issue in *Schmitt* concerned the discretion afforded to county boards of elections to certify the sufficiency and validity of petitions without giving aggrieved initiative proponents the right to immediate judicial review.  *Id.*  If a board determined a petition met the requirements of Ohio law, then the board was required to "promptly transmit a copy of the petition and a notice of the board's determination to the office of the secretary of state."  *See* Ohio Rev. Code

§ 3501.38(M)(2).  In other words, proponents of municipal-ordinance initiatives had nothing left to do following the board's transmittal to the secretary of state.  But if the board determined a petition did not satisfy Ohio law, *Schmitt* proponents who wished to challenge the board's decision had to "seek a writ of mandamus in Ohio state court requiring the board of elections to put the initiative on the ballot." *Id.*  We held that this imposed a burden "somewhere between minimal and severe," because it did not "result in 'virtual exclusion' from the ballot" but only limited ballot access.  *Id.* at 640–41.  *Schmitt*, however, assessed a regulation that was "'a step removed from the communicative aspect' of core political speech," and thus is not an apt comparator to the facts of this case.  933 F.3d at 638 (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 212 (2010) (Sotomayor, J., concurring)).  As explained above, § 3519.01 falls within the *Grant* and *American Constitutional Law Foundation* line of cases that address "core political speech."  Accordingly, the district court abused its discretion when it applied an intermediate level of scrutiny.  *See* R. 21 (D. Ct. Order at 14–15) (Page ID #216–17).

### b.  Balancing the State's Interests

Having determined that § 3519.01 severely burdens Plaintiffs' "core political speech," we now consider whether the state's interests survive strict scrutiny.[12]  Although "[*Grant*] used the phrase 'exacting scrutiny' to describe the governing test, the Court applied standards that today go by 'strict scrutiny.'" *Lichtenstein*, 83 F.4th at 586 (quoting *Grant*, 486 U.S. at 420).  "When a State places a severe or significant burden on a core political right, like here, it faces a 'well-nigh insurmountable' obstacle to justify it." *Citizens for Tax Reform*, 518 F.3d at 387 (quoting *Grant*, 486 U.S. at 425)).  We "will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).  "Reliance on suppositions and speculative interests is not sufficient to justify a severe burden on First Amendment rights." *Libertarian Party of Ohio*, 462 F.3d at 593.

---

[12]Although the district court applied only intermediate scrutiny to Plaintiffs' claims below and, therefore, we are applying strict scrutiny in the first instance, we are mindful of the expedited nature of this case.  In light of this, and because both parties have briefed the strict-scrutiny analysis and neither party has requested that we remand to the district court, we assess whether § 3519.01 survives strict scrutiny.

The state's asserted interests here are "voter education, fraud deterrence, and the integrity of the initiative process and election." D. 19 (Appellee Br. at 35). We agree that these interests are compelling. *See Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) (explaining that a state's "interest[] in preserving the integrity of its elections, protecting 'voters from confusion and undue influence,' and 'ensuring that an individual's right to vote is not undermined by fraud in the election process' are compelling" interests (quoting *Burson v. Freeman*, 504 U.S. 191, 199 (1992))).

Yost must also "demonstrate that there was no less restrictive means by which [the state] could achieve its important interest[s]," *Lawrence v. Blackwell*, 430 F.3d 368, 375 (6th Cir. 2005), and that the law "is necessary . . . in order to meet [the state's] concerns," *Grant*, 486 U.S. at 426. In Yost's view, § 3519.01 is narrowly tailored because he has limited discretion and must issue a certification decision within ten days of receiving the summary and proposed amendment. D. 19 (Appellee Br. at 36). Moreover, Yost contends that "Ohio law guarantees an automatic and immediate right to Supreme Court of Ohio review of any certification denial." *Id.* (citing Ohio Rev. Code § 3519.01(C)).

Yost's argument turns Ohio's law on its head. Rather than provide limited discretion to the Attorney General, in this case Yost has issued multiple denials—six based on the fair-and-truthful determination—without any review by an administrative body or court. *See* D. 19 (Appellee Br. at 11). And, although Yost is correct that § 3519.01(C) provides for original jurisdiction in the Supreme Court of Ohio, it does not require that court to review the case within a reasonable time, in light of the election deadlines. Instead, because Plaintiffs must submit their approximately 400,000 signatures 125 days before the election and the Supreme Court of Ohio's mandatory-expedited review applies only to cases filed within ninety days of the election, the mandatory-expedited review will *never* apply. *See* Ohio Sup. Ct. R. Prac. 12.08(A)(1) (explaining that the Supreme Court of Ohio is required to expedite cases only when filed within ninety days of the election). And, likely due to Yost's arguments made in opposition to Plaintiffs' motion to expedite before the Supreme Court of Ohio, that court declined to expedite. Yost's failure to certify Plaintiffs' summary and the lack of timely review thereof has thus forced

Plaintiffs to change their speech in the summary *regardless of whether it was fair and truthful* under Ohio law.

Likewise, § 3519.01, as applied here, is not the least restrictive means to protect the state's interest in voter education, fraud deterrence, and the integrity of the initiative process. We agree that these interests are served by Yost's fair-and-truthful review; however, this review unnecessarily burdens Plaintiffs' core political speech because, as explained above, Yost's determination is unlikely to receive *any* review. There are less restrictive alternatives that would protect the state's interests such that Yost could conduct the fair-and-truthful review under circumstances that would allow for judicial review *and* preserve Plaintiffs' ability to speak about their proposed amendment. For example, Yost could have supported—or indeed, sought— expedited review before the Supreme Court of Ohio. *See* D. 20 (Appellant Reply Br. at 11). If that court had expedited its review such that it had rendered a decision with sufficient time before the July 3 deadline, the state's interests in conducting the fair-and-truthful review would have remained intact, as would Plaintiffs' First Amendment rights. Alternatively, § 3519.01 could be applied at a different point in the ballot-initiative process, such as after the 400,000- signature deadline, and petitioners could gather signatures without a summary. Doing so would remove the exigency of signature gathering while maintaining Ohio's interests—voter education, fraud deterrence, and the integrity of the initiative process—by ensuring that the summary on the ballot for the election is fair and truthful. Ohio could also limit the summary requirement to particularly long or complex proposed amendments, thus limiting the circumstances in which fair and truthful review is triggered, while still educating voters, deterring fraud, and protecting the initiative process. It is the state's obligation to narrowly tailor this process. We note these examples merely to demonstrate that § 3519.01 is not the least restrictive means.

Accordingly, Yost has not shown that § 3519.01 is narrowly tailored to the state's interests, and Plaintiffs are therefore likely to succeed on the merits of their First Amendment Claim.[13]

---

[13]Because we find that Plaintiffs are likely to succeed on their as-applied claim, we do not address their facial challenge.

## C. Balance of the Remaining Injunction Factors

Because Plaintiffs have demonstrated a likelihood of success on their constitutional claim, "there is 'no issue as to the existence of the remaining preliminary injunction factors.'" *ACLU Fund of Mich. v. Livingston County*, 796 F.3d 636, 649 (6th Cir. 2015) (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)); *see also ACLU of Ky. v. McCreary County*, 354 F.3d 438, 462 (6th Cir. 2003) (explaining that when "Plaintiffs have demonstrated a likelihood of succeeding on the merits of their [First Amendment] claim, the other three preliminary factors follow in favor of granting the injunction" (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998))). We will, nonetheless, briefly consider each factor in turn.

The second factor to be considered when analyzing a motion for a preliminary injunction is "whether the movant would suffer irreparable injury absent the injunction." *Bays*, 668 F.3d at 818–19. "As we have explained, 'even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.'" *ACLU Fund of Mich.*, 796 F.3d at 649 (quoting *Miller*, 622 F.3d at 540); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Bays*, 668 F.3d at 825 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.))). Here, Yost's enforcement of § 3519.01 against Plaintiffs impairs their freedom of "expression of a desire for political change and" their ability to discuss "the merits of the proposed change." *Grant*, 486 U.S. at 421. Plaintiffs' "constitutional rights" are thus "impaired, [and] irreparable injury is presumed." *Obama for Am.*, 697 F.3d at 436. Yost's contention that Plaintiffs are not harmed because they can "file a corrected version of their initiative petition that meets the State's requirements," D. 19 (Appellee Br. at 37), misses the mark because doing so would create the harm—altering Plaintiffs' political speech—that Plaintiffs endeavor to protect.

The final two factors are "whether the injunction would cause substantial harm to others," and "whether the public interest would be served by the issuance of an injunction." *Bays*, 668 F.3d at 819. We have previously held that there can be "no cognizable harm" caused by

"stopping unconstitutional conduct, so 'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001)).  Likewise, when a "plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere [in] its enjoinment." *Bays*, 668 F.3d at 825 (quoting *Deja Vu of Nashville*, 274 F.3d at 400).  Yost's argument that enjoining his enforcement of § 3519.01 against Plaintiffs would harm the public by allowing a misleading summary to proceed to the next phase assumes the merits of the underlying claim and ignores the law outlined above.  *See* D. 19 (Appellee Br. at 40–43); *see also* D. 20 (Appellant Reply Br. at 19) ("[Yost's argument] presumes he is correct and uses this presumption" to argue that "voters might be misled.").  Thus, on that basis, and because Plaintiffs have a strong likelihood of success on the merits, these final two factors also weigh in Plaintiffs' favor and counsel for a preliminary injunction.

## D.  Remedy

With each of the injunctive-relief factors weighing in Plaintiffs' favor, we reverse the district court and grant Plaintiffs' request for preliminary injunctive relief, enjoining Yost from enforcing § 3519.01 against Plaintiffs' proposed constitutional amendment.  The ongoing harm to Plaintiffs' First Amendment rights is Yost's repeated failure to certify their summary.  Our opinion today alleviates that harm by enjoining Yost's authority under § 3519.01 to certify or decline to certify Plaintiffs' summary.  Instead, Yost must send Plaintiffs' proposed amendment and the most recent summary to the ballot board for the next phase of the process.

This case reaches us under extraordinary circumstances.  Injunctive relief of restrictions on core political speech in the ballot-initiative process is appropriate where, like here, (1) the Attorney General has rejected Plaintiffs' summary on multiple occasions over a long period—it is not a situation of petitioners delaying submission or otherwise self-inflicting this ongoing harm; (2) the 125-day deadline is fast approaching and, as of the time of writing, is less than fifty days away; (3) Plaintiffs sought expedited review in the Supreme Court of Ohio; (4) the Attorney

General opposed expedited review; and (5) the Supreme Court of Ohio has, at this point, not reviewed the Attorney General's decision.[14]

We now turn to Yost's policy-related arguments against granting Plaintiffs' requested relief.  Yost invokes a laundry list of worst-case-scenario outcomes of this court granting an injunction in this case.  *See* D. 19 (Appellee Br. at 32–33).  But none of these outcomes are likely to occur.  First, Yost suggests that Plaintiffs' "novel theory" would "preclude most of [Ohio's] ballot-initiative safeguards," such as the single-subject review by the ballot board and the Secretary of State's signature review.  *Id.* at 32.  But, as discussed above, Plaintiffs challenge the Attorney General's review of their summary, which presents a different speech question than the ballot board's review of the text of a proposed constitutional amendment, law, or referendum.  *Cf. Schmitt*, 933 F.3d at 638 (explaining that the ballot board's legislative-administrative determination is a "'structural decision[]'" that 'inevitably affect[s]—at least to some degree—the individual's right to speak about political issues and to associate with others for political ends'" and that such regulations "are 'a step removed from the communicative aspect' of core political speech" (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 212 (2010) (Sotomayor, J., concurring))).  Notably, this court has already found that such restrictions survive scrutiny.  *See Comm. to Impose Term Limits on Ohio Sup. Ct. & to Preclude Special Legal Status for Members & Emps. of Ohio Gen. Assembly v. Ohio Ballot Bd.*, 885 F.3d 443, 445–47 (6th Cir. 2018) (upholding Ohio's single-subject rule); *Taxpayers United*, 994 F.2d at 296–97 (upholding Michigan's signature requirement for ballot initiatives).

Nothing in this opinion conflicts with this settled law because, as those cases make clear, those other provisions are a step removed from core political speech.  *See Taxpayers United*, 994 F.3d at 297 ("Our result would be different if, as in [*Grant*], the plaintiffs were challenging a restriction on their ability to communicate with other voters about proposed legislation . . . .");  *Comm. to Impose Term Limits*, 885 F.3d at 446 (agreeing with the Supreme Court of Ohio's determination that the single-subject rule does not regulate core political speech).

---

[14]Our dissenting colleague's concern that this "solution throws the baby out with the bathwater" is overstated.  Dissent at 41.  As noted, today's opinion and preliminary injunction are limited to these extraordinary circumstances.

Put differently, because this case involves "core political speech," it triggers strict scrutiny based on the *Grant* and *American Constitutional Law Foundation* line of cases, as opposed to analysis only under the traditional *Anderson-Burdick* balancing. *See Lichtenstein*, 83 F.4th at 583–94.

Next, Yost contends that other ballot-initiative proponents will "invoke equal protection principles to extend" this court's ruling to other ballot-initiative petitions, "regardless of the ballot confusion, misinformation, or incomprehensibility that would result." D. 19 (Appellee Br. at 32–33). But, again, there is no reason to believe that this would occur. As with any as-applied constitutional challenge, each case presents unique factual circumstances that would be addressed based on the litigants before a particular court.

Finally, Yost invokes federalism principles to argue that this court's decision would force federal and state courts to expedite their review of all ballot-initiative certification decisions. *Id.* (Appellee Br. at 33). This too is unlikely to occur because, as already explained, this case does not apply so broadly. Federal courts often find that state or local laws violate the federal Constitution; indeed, that is the basic premise of the Supremacy Clause. And state laws and court rules often require state courts to conduct expedited review. *See, e.g.*, Ohio Sup. Ct. R. Prac. 12.08(A)(1). Finally, we make no statement today about what federal courts are required to do in election cases, as such a question is not before us. At bottom, Yost's arguments concern facts and legal questions that are not before this court.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's order and **GRANT** Plaintiffs' motion for preliminary injunctive relief, enjoining Yost's ability to enforce Ohio Revised Code § 3519.01 against Plaintiffs. We therefore order Yost to send Plaintiffs' proposed amendment and the most recent summary to the ballot board for the next phase of the process. We also **DENY** as moot Plaintiffs' motion for an injunction pending appeal.

-------------------------

### DISSENT

-------------------------

JOHN K. BUSH, Circuit Judge, dissenting.   Plaintiffs seek to amend the Ohio Constitution.  They have a big problem, though.  According to the Ohio Attorney General, Plaintiffs have not provided a fair and truthful statement that summarizes the amendment, as Ohio law requires.  In the case before us, Plaintiffs do not challenge the Attorney General's determination that their summary was improper.[1]  Rather, Plaintiffs bring First Amendment challenges to the Ohio laws that give the Attorney General the authority to review and reject constitutional amendment summaries and that provide for Ohio Supreme Court review of the Attorney General's determinations. But after Plaintiffs filed the case before us—indeed, *after* we had granted expedited review of their appeal—Plaintiffs dismissed their appeal to the Ohio Supreme Court of the Attorney General's decision.  To recite those facts is to create an issue spotter highly adverse to Plaintiffs.  For a multitude of reasons, we should affirm the district court's order denying preliminary injunctive relief to Plaintiffs.  They lack standing, their claims are barred by Ohio's sovereign immunity, and their as-applied challenge is moot.  Even if Plaintiffs had overcome those jurisdictional hurdles, a preliminary injunction would not be warranted because they are unlikely to succeed on the substantive constitutional merits. I therefore respectfully dissent.

-------------------------

[1]Nor could they.  Because Plaintiffs challenged the substance of the Attorney General's certification denial in their complaint for a writ of mandamus before the Ohio Supreme Court, had they brought the same claim in federal court, it would have been barred under the *Colorado River* abstention doctrine.  *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818-819 (1976); *Romine v. Compuserve Corp.*, 160 F.3d 337, 339–40 (6th Cir. 1998) (explaining that abstention is appropriate where there is a parallel state proceeding, meaning that the federal claims involve the same parties, allegations, and material facts as the state claims); *see* Appellant Br. at 12 ("Appellants do not here challenge the merits of Yost's four objections. That would be for the Ohio Supreme Court, if it were to act in a timely fashion."); *id.* at 17 (agreeing that the district court's abstention analysis, which concluded that Plaintiffs' federal claims were not barred by abstention because they did not challenge the merits of the Attorney General's decision, was correct).

# I.

## A.    Ohio's Ballot Initiative Process

Ohio law establishes a multi-step process for placing a citizen-initiated constitutional amendment on the ballot.  Citizens interested in proposing an amendment must first designate a committee of three to five people to act as their representatives.  Ohio Rev. Code § 3519.02.  The committee is required to submit a petition containing the proposed amendment, a summary, and supporting signatures from at least 1,000 qualified Ohio electors to the Ohio Attorney General for review.  *Id.* § 3519.01(A). The Attorney General then "conduct[s] an examination of the summary," determining if it is a "fair and truthful statement of the proposed . . . constitutional amendment." *Id.*  The purpose of the summary requirement is twofold: it helps those who may be interested in supporting the amendment to "understand the content of the law more efficiently," and it serves as an "accessible check against misrepresentations and misstatements." *Schaller v. Rogers*, No. 08AP-591, 2008-Ohio-4464, 2008 WL 4078446, at *10 (Ohio Ct. App. Sept. 4, 2008).

If the proposed summary is determined to be fair and truthful, the Attorney General must certify the petition and submit it to the Ohio Ballot Board for approval.  Ohio Rev. Code § 3519.01(A).  Following approval from the Board, the committee may create an initiative petition and must collect supporting signatures from 10% of electors for the initiative to go to the voters. *See* Ohio Const., art. II, § 1a.  Once those signatures are obtained, the committee then files the petition and signatures with the Secretary of State, who, after verifying the signatures and receiving final approval from the Ballot Board, may place the proposed amendment on the ballot.  Ohio Rev. Code § 3505.062(D).  The committee must file its petition and signatures within 125 days of the election to get its amendment on the ballot, although petitioners may be granted more time to add signatures.  Ohio Const., art. II, §§ 1a, 1g.

If, however, the Attorney General declines to certify the petition, "[a]ny person who is aggrieved by [the decision] may challenge the certification or failure to certify of the attorney general in the [Ohio] supreme court."  Ohio Rev. Code § 3519.01(C).  The rules of practice of the Ohio Supreme Court provide for expedited review of election challenges filed within 90 days

of an election, but there is no required timeline for reviewing challenges filed outside of that window.  *See* Ohio S. Ct. R. Prac. 12.08(A)(1).

**B.      Plaintiffs' Proposed Amendment and Ohio Procedural History**

Plaintiffs seek to place their proposed amendment, "Protecting Ohioans' Constitutional Rights," on the ballot for the upcoming general election.  Compl., R. 1, PageID 6–7.  Because the election is scheduled for November 5, 2024, Plaintiffs must file their petition with supporting signatures by July 3, 2024.

The proposed amendment creates a private cause of action against state "government actor[s]" who "cause any person to be subjected to deprivation of any [state] constitutional right."  *Id.* at PageID 34.  It defines a government actor as the "State, any political subdivision thereof," and their elected officials, as well as any employees, agents, and independent contractors of the state or its subdivisions.  *Id.*  Notably, the proposed amendment states that government actors may not rely on qualified immunity, sovereign immunity, prosecutorial immunity, and any other immunity available to the state and its employees in actions filed under the amendment.

Plaintiffs have sought certification of their proposed amendment from the Attorney General several times before, but their efforts have proved unsuccessful thus far.  Most recently, they submitted a petition with their proposed amendment, summary, and signatures to Attorney General Yost on March 5, 2024.  On March 14, 2024, Yost rejected their summary for three reasons.  He first explained that the summary is misleading because it states that government actors may not rely upon "any immunities or defenses, or any subset thereof, which are only available to government actors," while the amendment itself "abrogates the immunities or defenses available to 'any subset' of *government actors*."  *Id.* at PageID 39.  Yost also found the discussion of the amendment's statute of limitations provision confusing: the summary states that "[a] claim under this Amendment must be commenced no later than six years from the date that the deprivation of a constitutional right is alleged to have occurred," and that "[a]ll claims must be commenced no later than six years from the date [of] the alleged constitutional violation."  *Id.*  The Attorney General explained that "a reader will likely assign significance" to the use of

repetitive language to describe the limitations period while distinguishing "[a] claim" from "[a]ll claims." *Id.* Finally, Yost found that using the word "protect" in the title, "Protecting Ohioans' Constitutional Rights," does not reflect the nature of the proposal because by abrogating governmental immunity, the amendment does not "proactively 'protect' Ohioans from violations of constitutional rights." *Id.* at PageID 39. Notably, Yost cited the misleading title as a reason he did not certify Plaintiffs' previous summary, submitted in November 2023. *Id.*

Plaintiffs sought review of Yost's decision before the Ohio Supreme Court on March 20, 2024. They sought a writ of mandamus directing Yost to certify their summary, and they claimed that the First Amendment demands "expedited and de novo review" of the certification decision. *State ex rel. Brown v. Yost*, No. 2024-0409, Compl., R. 1, ¶ 159. They also filed a motion to expedite proceedings, arguing that "if Ohio's certification-process did not require de novo . . . expedited timely review in [the state supreme court], it would place a 'severe' burden on [Plaintiffs'] First Amendment rights." *Id.*, Mot. for Expedited Review, R. 2, p. 3. The Attorney General opposed the motion, and the Ohio Supreme Court, without comment, denied Plaintiffs' request for expedited review. Yost filed a motion to dismiss the petition in April 2024, and Plaintiffs opposed the motion.

## C.    Federal Procedural History

Seven days after filing their mandamus action in state court, Plaintiffs filed a complaint for declaratory relief, a preliminary injunction, and a temporary restraining order in federal district court. They claim that the ballot initiative process outlined in § 3519.01 violates the First Amendment, both facially and as applied to their March 2024 petition. Specifically, they claim that the state's "delegation to [Yost] of the authority to reject summaries of proposed constitutional amendments pursuant to [§ 3519.01(A)] coupled with its failure to provide for immediate judicial review and resolution in the Ohio Supreme Court under [§ 3519.01(C)]" is facially unconstitutional. Compl., R. 1, PageID 10. For their as-applied challenge, they claim that the Ohio Supreme Court's refusal to "hear Plaintiffs['] challenge under any form of emergency scheduling" and Yost's "formal object[ion] to expedited review" violated their First Amendment rights. To remedy their constitutional injury, they ask the district court to (1) declare that §§ 3519.01(A) & (C) are unconstitutional facially and as applied, (2) direct Yost

to certify their summary and proposed amendment to the Ohio Ballot Board, and (3) enjoin Yost from "enforcing [§ 3519.01(A)] without a proper form of immediate expedited judicial review and resolution." *Id.* at PageID 12.

Plaintiffs moved for a temporary restraining order and preliminary injunction on the same day they filed their complaint. The district court denied the motion on April 25, 2024. It found that Plaintiffs' claims are not barred by the Eleventh Amendment because they seek expedited review of Yost's decision in state court. Such relief, the district court determined, was prospective relief that "is not based on the alleged incorrectness of a past decision, but on prospectively addressing a violation of their Asserted First Amendment right." Order on Mot. for Prelim. Inj., R. 21, PageID 207. The district court also found that abstention principles do not bar Plaintiffs' federal action because their First Amendment claims can be resolved independently from any state law issue in the case, and because this action is not parallel to Plaintiffs' action before the state supreme court. However, the district court denied the motion based on Plaintiffs' lack of standing, explaining that Plaintiffs failed to establish that their injury—that is, being denied expedited review before the Ohio Supreme Court—is fairly traceable to Yost, or that ordering Yost to certify their petition would redress their alleged First Amendment harm. *Id.* at PageID 209–12.

The district court also found that Plaintiffs' claims were not likely to succeed on the substantive constitutional merits. *Id.* at PageID 212–21. Applying the *Anderson-Burdick* framework to the state's ballot-initiative requirements, the district court found that the lack of mandatory expedited review of Yost's decision did not constitute a severe burden on Plaintiffs' First Amendment rights, such that strict scrutiny would apply. *Id.* at PageID 214–16. The district court found that Plaintiffs similarly failed to establish a severe burden for purposes of their as-applied challenge, because they did not show that they were actually excluded from the November ballot as a result of Ohio's ballot initiative scheme. *Id.* at 218–21. The district court declined to apply rational basis review, however, because it determined that the state's review process more than minimally burdened Plaintiffs' rights to access the ballot. *Id.* at 216. But weighing the "'burden of the restriction' against the 'state's interests and chosen means of pursuing them,'" the district court held that Ohio's interest in "safeguarding its citizens against

false and misleading summaries" of proposed amendments outweighed any burden resulting from the lack of de novo, expedited review. *Id.* at 216–17.

After the district court denied Plaintiffs' motion for injunctive relief, and while Yost's motion to dismiss their mandamus action was still pending before the Ohio Supreme Court, Plaintiffs moved to voluntarily dismiss their state-court case. The dismissal came after we had agreed to hear Plaintiffs' appeal on an expedited basis. Thus, Plaintiffs have placed all of their eggs in the federal-court basket even though their proposed amendment is entirely a matter of state law. Indeed, they do not currently have a petition being considered for certification by Yost or under review by the Ohio Supreme Court. These circumstances create a host of reasons, discussed below, why Plaintiffs are unlikely to succeed on the merits and why the district court therefore properly denied the preliminary injunction.

## II.

Plaintiffs lack the requisite standing under Article III to bring their claims. "Article III . . . is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 476 (1982). And "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (internal quotation marks omitted); *see* U.S. Const., art. III, § 2. A case or controversy exists only if a plaintiff has standing to sue. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). This "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system," and ensures that "federal courts 'prevent the judicial process from being used to usurp the powers of the political branches.'" *United States v. Texas*, 599 U.S. 670, 675–76 (2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

Standing consists of three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–560 (1992). The plaintiff must establish that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing

*Lujan*, 504 U.S. at 560). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion*, 594 U.S. at 423 (cleaned up). Here, as explained below, Plaintiffs falter on all three standing requirements.

## A.

First, the asserted injury. The parties here do not argue whether Plaintiffs suffered an injury in fact. Notwithstanding, we have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). So, we must assess whether Plaintiffs have alleged "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. When seeking declaratory and injunctive relief, as Plaintiffs do here, "a pre-enforcement challenge may be made before the actual completion of an injury in fact." *Grendell v. Ohio Sup. Ct.*, 252 F.3d 828, 832 (6th Cir. 2001). However, Plaintiffs "must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." *Id.* (quoting *Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). "Past exposure to illegal conduct does not in itself show a present case or controversy . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 (1983).

Plaintiffs' alleged harm is the burden placed on their First and Fourteenth Amendment right to political speech. They say this is the result of an unconstitutional combination: Yost's enforcement of Ohio Rev. Code § 3519.01, coupled with the unavailability of "timely" judicial review. *See* Compl., R. 1, PageID 6, 10–11 (alleging that Ohio's delegation of authority to Yost to reject summaries of proposed constitutional amendments, and Yost's exercise of that authority, "coupled with" the lack of "immediate judicial review" violates the First Amendment); Appellant Br. at 25 (stating that § 3519.01 can "survive First Amendment scrutiny" only "if [Yost] and Ohio can demonstrate that expedited, de novo, and 'timely redress' is available" before the state supreme court).

Put differently, Plaintiffs do not challenge Yost's role as gatekeeper as to the fairness and truthfulness of their summary—they instead challenge his exercise of the gatekeeping function without timely, de novo judicial review.  In other words, the lack of timely, de novo judicial review is what creates a First Amendment issue for an otherwise constitutional election mechanics rule.  We explained in *Schmitt v. LaRose* that the Ohio Supreme Court's mandamus review of election decisions is "essentially" de novo judicial review.  933 F.3d 628, 639–640 (6th Cir. 2019); *see also Beiersdorfer v. LaRose*, No. 20-3557, 2021 WL 3702211, at *7 (6th Cir. Aug. 20, 2021).  Plaintiffs here filed a complaint for a writ of mandamus with the Ohio Supreme Court after Yost declined to certify their summary—so they got their de novo review.  And they acknowledged in the federal case that they are not challenging the merits of Yost's decision.  *See supra* n.1.  Their argument before us therefore now depends on whether the state court's review was untimely.  Indeed, in the district court, their complaint focuses largely on the fact that Ohio law and the Ohio Supreme Court's own procedural rules do not require expedited review of their complaint for a writ of mandamus.  They focus on timeliness before us, too, arguing that being unable to seek mandamus is not enough; instead, they assert that they have a right to seek redress for their alleged harm before the November election.

These assertions are not enough to allege an injury that supports Article III standing.  Although Plaintiffs submitted a summary of their constitutional proposal multiple times to Yost, and faced rejection each time, they challenged his decision in the Ohio Supreme Court only once.  Now that they have withdrawn their complaint for a writ of mandamus from the Ohio Supreme Court, there is no "actual present harm" caused by untimely judicial review, because there *is* nothing for the Ohio Supreme Court to review.  *Nat'l Rifle Assoc. of Am.*, 132 F.3d at 279.  Moreover, while Plaintiffs' previous efforts to get their summary certified supports an inference that they will file another constitutional proposal in the future, given that they have only asked for judicial review once, they have not demonstrated a "significant possibility" that they will experience their alleged harm in the future.  *Id.*; *Grendell*, 252 F.3d at 832.  ("[W]here the threat of repeated injury is speculative or tenuous, there is no standing to seek injunctive relief.").  The threat of future harm is therefore conjectural and insufficient to support standing.

The majority characterizes Plaintiffs' injury as their "inability to advocate for and speak about the proposed amendment how they wish." Majority at 12. But Plaintiffs do not allege that Yost has done anything to deny them their ability to "advocate for and speak about the proposed amendment" other than that Yost did not approve Plaintiffs' summary and they have not received timely state-court review of Yost's decision. Plaintiffs do not allege, for example, that they have been prevented from advocating in the news media, through social media, and in person for voters to support the proposed amendment. Also, contrary to what the majority implies, *see* Majority at 27 n.9, Plaintiffs' complaint in federal court is not about suppression of the content of the summary: Plaintiffs *do not argue before us* that Yost made an incorrect determination that their summary was untruthful and unfair. *See supra* n.1. Rather, Plaintiffs' claims before us are based on the alleged injury that *they have not received timely Ohio Supreme Court review of Yost's decision*. That injury, however, no longer exists because, through their own actions, Plaintiffs' state-court appeal is no longer pending. Thus, any cognizable injury that Plaintiffs may have had in the district court no longer exists on appeal.

## B.

Second, traceability. Even if Plaintiffs had alleged a sufficient injury in fact, that injury is not fairly traceable to Yost's conduct that is the basis of their complaint. As explained, Plaintiffs' asserted injury turns entirely on the lack of timely judicial review. They say that their injury is fairly traceable to Yost because he enforces the statute that fails to provide for expedited judicial review, and because the Ohio Supreme Court's procedural rules do not provide for expedited judicial review.

Yet the Ohio legislature could *not* have statutorily required the Ohio Supreme Court to decide Plaintiffs' challenge on any particular schedule. Just as Article III of the United States Constitution vests the judicial power in the federal courts, so too does Article IV, § 1 of the Ohio Constitution vest the judicial power in its courts. As a result, "the legislative branch of the [Ohio] government is without constitutional authority to limit the judicial branch of the government in respect to when it shall hear or determine any cause of action within its lawful jurisdiction." *Schario v. State*, 138 N.E. 63, 64 (Ohio 1922); *Vill. of Groveport v. Lovsey*, No. 95APC01-83, 1995 WL 527769, at *4 (Ohio Ct. App. Sept. 5, 1995) (same, holding that a statute

impeding on the courts' ability to grant a stay to be unconstitutional). Accordingly, Ohio courts have interpreted statutorily imposed decision deadlines as advisory and held that they do not lose jurisdiction for failing to comply with such statutes. *See*, *e.g.*, *James v. West*, 65 N.E. 156, 158 (Ohio 1902) (Statute requiring causes submitted on motion to be determined and adjudicated within 30 or 90 days of submission is "directory" and "does not have the effect to deprive the court . . . of jurisdiction"); *Dayton Women's Health Ctr., Inc. v. Enix*, 621 N.E.2d 1262, 1265 (Ohio Ct. App. 1993) (abrogated on other grounds); *Merritt v. Anderson*, No. CA2008-04-010, 2009 WL 975749, at *2 (Ohio Ct. App. April 13, 2009).

Plaintiffs' injury is therefore not fairly traceable to Yost's enforcement of § 3519.01 because that injury was caused solely by the Ohio Supreme Court. The Ohio legislature could not order, nor could Yost enforce, any rule mandating that the state supreme court take up Plaintiffs' challenge on an expedited basis. And to the extent Plaintiffs blame the Ohio Supreme Court, their injury is also not traceable to Yost because it "results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976).

## C.

Finally, redressability: "To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (cleaned up). The injury allegedly suffered by Plaintiffs is a burden on their First Amendment right to political speech, coupled with the lack of timely judicial review. Plaintiffs ask the court to fix this purported injury by preventing Yost from enforcing § 3519.01 altogether. But that would not redress the alleged injury.

First, because the Ohio Supreme Court is alone responsible for the schedule on which Plaintiffs' petition is reviewed, enjoining Yost from enforcing § 3519.01 would not deal with the alleged lack of timely judicial review; it would only stop Yost from enforcing a rule that Plaintiffs do not claim is, alone, unconstitutional. Second, we cannot order Yost to require that the state supreme court allow for expedited briefing because he lacks the power to impose such a requirement. Admittedly, if we enjoin Yost from enforcing the statute, Plaintiffs would be able

skip over this step in Ohio's ballot procedures entirely and judicial review would not be needed. But because they do not claim that the certification requirement is itself unconstitutional, that solution throws the baby out with the bathwater. Under Plaintiffs' proposed remedy, the Attorney General would be forced to approve any proposed constitutional amendment, regardless of whether it meets the fair-and-truthful standard. The absurdity of that result reveals that Plaintiffs' real grievance is with the Ohio Supreme Court, which did not address their motion for a writ of mandamus on an expedited basis, rather than with Yost.

### D.

Plaintiffs therefore fail to satisfy any of the three requirements of standing. They have no cognizable Article III injury. Their harm is based on the absence of timely Ohio Supreme Court review of the Attorney General's decision; yet, having dismissed their appeal to the Ohio Supreme Court, Plaintiffs' "injury" from an untimely decision from that court no longer exists and the unavailability of review from that court is now entirely of their own making.

Even if their appeal were still pending in the Ohio Supreme Court, their asserted injury would not be redressed by the relief they seek from us. Assuming the state-court appeal were still pending, no matter what relief the district court granted, it could not have ordered the Ohio Supreme Court directly or indirectly through the Attorney General to expedite the state court appeal. For similar reasons, the alleged injury is not fairly traceable to any constitutional violation by the Attorney General.

### III.

Plaintiffs' claims also are barred by the sovereign immunity of Ohio. The "Eleventh Amendment bars suits against a state or its agencies in federal court." *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 681 (6th Cir. 2018). But under the *Ex parte Young* exception to sovereign immunity, a private party may "seek prospective injunctive relief against state officials in their official capacity before those officials violate the plaintiff's federal constitutional or statutory rights." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 733 (6th Cir. 2022). The Attorney General argues that Plaintiffs claims are barred by sovereign immunity because they seek retroactive relief. I agree that the claims are barred by sovereign immunity, but for a

different reason.  *See Barachkov v. Davis*, 580 F. App'x 288, 299 (6th Cir. 2014) ("A state may waive its immunity through its litigation conduct; but the touchstone of waiver doctrine is intent—the state's litigation conduct must clearly indicate the state's intent to waive its immunity.").  In my view, because the alleged constitutional violation turns on whether Plaintiffs are afforded timely judicial review, and that is a matter decided solely by the Ohio Supreme Court, prospective injunctive relief against Yost would do nothing to remedy the alleged constitutional violation.  Instead, for the reasons detailed above, it seems that Plaintiffs are trying to attach to Yost claims that they would like to bring, but cannot, against the Ohio Supreme Court.  The *Ex Parte Young* exception, therefore, does not apply because there was no prospective relief that Plaintiffs could obtain against Yost: the decision as to whether to expedite the state-court appeal was in the hands of the Ohio Supreme Court, not the Attorney General.

## IV.

Another jurisdictional hurdle Plaintiffs do not overcome is mootness.  Plaintiffs have dismissed their complaint requesting a writ of mandamus to force Yost to certify their summary before the Ohio Supreme Court.  They have not filed another proposal for a constitutional amendment or sought additional judicial review of their last-denied certification.  Because their challenge turns on the timeliness of judicial review and they currently have nothing before the Ohio courts to review, their as-applied challenge to § 3519.01 is moot.

The majority excuses Plaintiffs' dismissal of their state-court appeal because, according to the majority, "timely state court review is functionally unavailable to Plaintiffs under the circumstances of this case."  Majority at 30 n.10.  The majority, however, cites no evidence in support of this conclusion.  In any event, Plaintiffs have an obligation, if they want their challenge seeking timely review from Ohio Supreme Court to remain a live controversy, to at least keep the opportunity for such review pending before that court.

## V.

Even were it appropriate to address the substantive constitutional merits of Plaintiffs' claims, they are not likely to succeed.  In my view, content neutral and non-viewpoint discriminatory statutes regulating state election mechanics—like the scheme set forth by

§ 3519.01—are not laws that implicate the First Amendment.  *Schmitt*, 933 F.3d at 643 (Bush, J., concurring).  But even if such statutes are reviewable under the First Amendment, rational basis review should apply, not *Anderson-Burdick*'s balancing test.  *Id.* at 645; *see Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993) ("[T]he right to initiate legislation is a wholly state-created right.").  As recognized in this circuit, *Anderson-Burdick* is mainly concerned with freedom of association challenges in ballot access cases, not disputes over election mechanics.  *Kishore v. Whitmer*, 972 F.3d 745, 749 (6th Cir. 2020) ("The *Anderson-Burdick* framework governs First and Fourteenth Amendment challenges to ballot-access restrictions."); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006) (starting the court's *Anderson-Burdick* analysis by determining how severely the government act burdened "associational rights").  And Plaintiffs do not allege a violation of their First Amendment associational rights.

For now, though, "our precedent dictates that we evaluate First Amendment challenges to nondiscriminatory, content-neutral ballot initiative requirements under the *Anderson-Burdick* framework."  *Thompson v. Dewine*, 959 F.3d 804, 808 (6th Cir. 2020); *see id.* at 808 n.2 (while recognizing that "this court has often questioned whether *Anderson-Burdick* applies to anything besides generally applicable restrictions on the right to vote," applying that framework "until this court sitting en banc takes up the question of *Anderson-Burdick*'s reach").

Before applying *Anderson-Burdick*, a word on why *Meyer v. Grant*, 486 U.S. 414 (1988) does not apply.  Under *Grant*, we assess government limitations on "core political speech" under strict scrutiny.  486 U.S. 414, 420 (1988) (subjecting "a limitation on political expression subject to exacting scrutiny"); *see Lichtenstein v. Hargett*, 83 F.4th 575, 586 (6th Cir. 2023) (explaining that *Grant*'s "exacting scrutiny" test "applied standards that today go by 'strict scrutiny.'").  *Grant* concluded that a state law prohibiting payment to petition circulators gathering signatures for ballot initiatives implicated core political speech because the regulated activity involved "interactive communication concerning political change."  *Grant*, 486 U.S. at 422; *accord Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 186 (1999).  By making it a felony to pay petition circulators, the state (1) limited "the number of voices who will convey" the message and "the size of the audience they can reach," and (2) restricted the initiative advocates' "ability

to make the matter the focus of statewide discussion." *Grant*, 486 U.S. at 422–23; *see also Citizens for Tax Reform v. Deters*, 518 F.3d 375, 380 (6th Cir. 2008) (applying *Grant* to an Ohio statute which prohibited compensating petition circulators for each signature they obtained).

But *Grant* does not factually fit challenges to election mechanics. *Schmitt*, 933 F.3d at 644 (Bush, J., concurring). *Grant* focuses on regulations affecting *who* makes the political speech, whereas *Schmitt* focuses on regulations affecting *how* political speech is reviewed. That distinction renders *Grant* inapposite, because Plaintiffs center their challenge to § 3519.01 on the inadequate procedures available to review Yost's adverse certification decision. Unlike the regulation in *Grant*, § 3519.01 does not target speakers or a class of speakers. Forcing *Grant* to apply here would elevate every electoral mechanics regulation to an infringement on core political speech, a result that goes against both precedent and reason.

Because this case does not trigger *Grant*'s default strict scrutiny test, *Anderson-Burdick* would set the level of scrutiny based on the scale of the burden imposed on Plaintiffs' rights by the regulation. *Kishore*, 972 F.3d at 749. Intermediate scrutiny applies here, as *Schmitt* makes clear. There, as here, the regulator "wield[ed] the discretionary authority to decline to certify initiatives, and the burden thus [fell] on the aggrieved proponent to obtain mandamus relief in order to vindicate his or her interest." *Schmitt*, 933 F.3d at 641. We determined that it was "reasonable to conclude that the cost of obtaining legal counsel and seeking a writ of mandamus disincentivize[d] some ballot proponents from seeking to overturn the [regulator's] decision, thereby limiting ballot access," so rational basis review could not apply. *Id.* Yet "because Ohio Supreme Court rules provide for expedited briefing and decision in election cases, aggrieved citizens who challenge an adverse decision are able to seek timely redress." *Id.* at 640.

Under *Anderson-Burdick* and *Schmitt*, § 3519.01 sufficiently burdens Plaintiffs' rights to preclude rational basis review: Ohio law requires Plaintiffs to challenge Yost's adverse certification decision by seeking a writ of mandamus with the Ohio Supreme Court, and Plaintiffs have obtained legal counsel to assist them in their challenge. But § 3519.01's burden does not rise to the level necessary to evaluate the statute under strict scrutiny. The Ohio Supreme Court's practice rules gave Plaintiffs a right to expedited review of their case had they filed their mandamus petition within ninety days of the election. Ohio Sup. Ct. R. Prac.

12.08(A)(1).  And, even though they filed their mandamus petition before that period, Plaintiffs still moved for expedited review; that the Ohio Supreme Court denied that motion bears more on their now-mooted as-applied challenge to § 3519.01, not their facial challenge.  Plaintiffs claim that the lack of timely review of Yost's decision itself amounts to a severe burden, such that strict scrutiny should apply.  But they fail to define, nor point to authority establishing, what amount of time would be reasonable for the Ohio Supreme Court to review their case for § 3519.01 to survive *Anderson-Burdick*.  All told, the district court properly reviewed § 3519.01 within the intermediate tier of scrutiny, which "weighs the state's interests and chosen means of pursuing them against the burden of the restriction."  *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016).[2]

Applying intermediate scrutiny, § 3519.01 survives the *Anderson-Burdick* balancing test.  Ohio's interests are clearly defined and well established: "states have a strong interest in 'ensuring that its elections are run fairly and honestly,' as well as in 'maintaining the integrity of its initiative process.'"  *Schmitt*, 933 F.3d at 641 (quoting *Austin*, 994 F.2d at 297).  Ohio's interests further extend to avoiding "overcrowded ballots," "keeping unauthorized issues off the ballot" to reduce "the odds that an initiative is later held invalid on the ground that the voters exceeded their authority to enact it," and "maintaining voter confidence in the electoral process." *Id.* (cleaned up).  Ohio also has a significant interest in declining to rush through reviewing proposed amendments that transform the state constitution, like Plaintiffs' proposal.  *Daunt v. Benson,* 956 F.3d 396, 409 (6th Cir. 2020) ("[A state] has a fundamental interest in structuring its government." (internal quotation marks and citation omitted)).

And how Ohio chose to pursue these interests does not unduly burden Plaintiffs.  Section 3519.01 gives Plaintiffs a right to petition for a writ of mandamus with the Ohio Supreme Court

---

[2]Plaintiffs argue that *Schmitt* mandates expedited review, lest a regulation impose a severe burden on plaintiffs that triggers strict scrutiny under *Anderson-Burdick*.  But Plaintiffs read too much into one sentence of that opinion.  *Schmitt*, 933 F.3d at 64 ("We also note that because Ohio Supreme Court rules provide for expedited briefing and decision in election cases, aggrieved citizens who challenge an adverse decision are able to seek timely redress.").  Whether the court evaluated the regulation under strict scrutiny there hinged on whether the plaintiffs possessed a right to de novo review against an alleged prior restraint, not whether the Ohio Supreme Court rules provided expedited briefing to seek timely redress under that regulation.  *Id.* at 639–40.  Plaintiffs may not transform this dictum into a per se rule requiring expedited review of adverse certification decisions.

against the Attorney General's adverse certification decisions. The Ohio Supreme Court, exercising its discretion not to expeditiously review the petition, may scrutinize Plaintiffs' challenge to the Attorney General's determination. *Anderson-Burdick* does not require the Ohio Supreme Court to rush through the process to reach a hasty decision.[3] These procedures are "not unreasonable given the significance of the interests [that the state] has in regulating elections." *Id.* at 642.

Because § 3519.01 survives the *Anderson-Burdick* framework, Plaintiffs are unlikely to succeed on the substantive constitutional merits. Thus, the district court properly denied the motion on that basis as well.

## VI.

Plaintiffs brought a targeted First Amendment complaint in federal court. They contended that a state election procedure violated their rights because they had not yet received review in the Ohio Supreme Court of the Attorney General's determination that the summary of their proposed constitutional amendment was not fair and truthful. After the district court denied a preliminary injunction, we granted expedited review. At that point Plaintiffs made the strategic decision to dismiss their appeal to the Ohio Supreme Court. Whatever jurisdictional basis that Plaintiffs might have argued for the federal case collapsed with their decision to dismiss their

---

[3]The authorities that Plaintiffs cite in support of their timely judicial resolution argument are readily distinguishable. In *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, the Supreme Court explained that its precedent required "prompt judicial decision" of adverse licensing decisions against First Amendment-protected businesses. 541 U.S. 774, 781 (2004) (reviewing the denial of a license under an adult business licensing ordinance). But it determined that "ordinary judicial review procedures suffice as long as the courts remain sensitive to the need to prevent First Amendment harms and administer those procedures accordingly. And whether the courts do so is a matter normally fit for case-by-case determination rather than a facial challenge." 541 U.S. 774, 781–82 (2004). In *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, we concluded that another adult business licensing ordinance also did not guarantee that First Amendment challenges to adverse decisions would reach a "final judicial adjudication on the merits," because state law vindicated those rights under a *discretionary* writ of certiorari. 274 F.3d 377, 401 (6th Cir. 2001) (internal quotation marks and citation omitted). In contrast, § 3519.01 *mandates* that the Ohio Supreme Court will hear the challenges to adverse certification decisions. And *Susan B. Anthony List v. Driehaus* addressed the disconnection between the purported state interest—the promotion for fair elections—and the timing of the final resolution of proceedings against those accused of making false statements about political candidates, which could occur after the election. 814 F.3d 466, 474 (6th Cir. 2016). The connection between the state interest here and timeliness of judicial review is far closer.

state-court appeal.  In addition to the jurisdictional challenges, Plaintiffs' claims are likely to fail on the constitutional merits.

For the foregoing reasons, the district court properly denied the preliminary injunction. I therefore respectfully dissent.